**KMART CORPORATION, Plaintiff,**

v.

**FIRST HARTFORD REALTY CORPO-RATION, Neil H. Ellis, individually and d/b/a "Putnam Parkade, Inc." and Wal–Mart Stores, Inc., Defendants.**

Civ. A. No. 2:92 CV00646 (AVC).

United States District Court,
D. Connecticut.

Jan. 4, 1993.

H. Bissell Carey, III, Raymond T. De-
meo, Joan Caron Goldenthal, Robert Victor
Nielson, Robinson & Cole, Hartford, CT,
Jon Robert Steiger, Bloomfield Hills, MI,
for plaintiff.

Barry D. Guliano, Dominic J. Squatrito,
James H. Howard, Phelon, Squatrito, Fitz-
gerald, Dyer & Wood, P.C., Manchester,
CT, L. Douglas Shrader, Beverly Stauffer
Knapp, Duncan M. Schmitt, Zeldes, Needle
& Cooper, Bridgeport, CT, Martin G. Gil-
bert, Wal–Mart Stores, Inc., Bentonville,
AR, for defendants.

## MEMORANDUM OF DECISION

COVELLO, District Judge.

This is an action for specific performance
of a contract, an injunction and other relief.
The plaintiff, KMart Corporation, (KMart),
seeks a temporary and permanent injunc-
tion restraining the defendants from inter-
fering with KMart's alleged leasehold in-
terest in a forty-six acre parcel of real
property located in Putnam, Connecticut.
The parties have asked the court to deter-
mine the equitable and liability issues only,
leaving the matter of damages, if any, to
the further order of the court. The court
concludes for the reasons hereinafter set
forth, that the plaintiff has a valid lease-
hold interest in the disputed premises; that
the defendants, First Hartford Realty Cor-
poration and Putnam Parkade, Inc. have

breached the covenants and agreements set forth in said lease; that the defendant, Wal–Mart Corporation, has purchased the property with knowledge of and subject to the lease. The court further concludes that equitable relief is not in order.

The court finds that the plaintiff, KMart Corporation (KMart), is a Michigan corporation. The defendant, First Hartford Realty Corporation (First Hartford), is a Delaware corporation with its principal offices in Manchester, Connecticut. The defendant, Neil H. Ellis (Ellis), is president of First Hartford Realty Corporation. The defendant, Wal–Mart Stores, Inc. (Wal–Mart), is a Delaware Corporation with its principal office in Bentonville, Arkansas.

First Hartford is a wholly owned subsidiary of First Hartford Corporation (FHC), a publicly owned corporation. FHC is engaged in the business of developing, owning and managing, investment real property. Other subsidiary corporations of FHC include Somersville Corporation, Adeps, Inc., Midway Green Corp., Parker Street Corp., Lubbock Parkade, Inc., Parkade Corp., Meriden Trading Company, Manchester–Windsor Industrial Corp., Hawthorn Management Services, Inc., Plainfield Parkade, Inc., Plainfield Green Condominium Corporation, Merchants Landing Condominium Corporation, and Putnam Parkade, Inc. (Ellis enterprises).

All of the Ellis enterprises are operated and controlled by Ellis and have as their principal place of business, 685 Parker Street, Manchester, Connecticut. All of the personnel at 685 Parker Street are employees of Adeps, Inc. and perform work interchangeably for all of the affiliates, rarely, if ever, keeping track of the specific time spent on the activities of a given affiliate. In addition to sharing the same staff, all of the corporations use the same telephones, filing system, computer support and copying equipment.

The Putnam Parkade project, which is the subject of the present dispute, was initially carried on the books of First Hartford Corporation as a separate department. In due course, the expenses with respect to it were journaled to a subgroup under Somersville Corporation. Other entities within the Ellis enterprises advanced monies as needed to the Putnam Parkade project. There were no debt instruments reflecting these transactions nor were there any provisions made for repayment of principal or interest. Following its incorporation, the Putnam Parkade project was detached from Somersville Corporation and adjusting entries made on the books of First Hartford Corporation to compensate for the monies previously advanced by the other affiliates. There was no money paid by Putnam Parkade, Inc. to Somersville Corporation for its interest in the Putnam Parkade project.

Between May 10, 1989 and January 26, 1990, Leonard Seader, vice-president of First Hartford, negotiated with various land owners, and in behalf of the Ellis enterprises, acquired options to purchase certain vacant land located at the intersection of Interstate Route I–395 and Route 44 in the town of Putnam, which is the subject matter of this suit. One of the options stood in the name of First Hartford while the remainder stood in the name of Somersville Corporation. Between May 10, 1989 and May 21, 1992, various of the Ellis enterprises paid $290,500 to maintain the viability of these options.

In October, 1989, Thomas A. Wardlow, a real estate representative for KMart, began negotiations with Ellis, Seader and Ellis' business associate, Morton Samose, for a lease of store premises to be constructed by First Hartford on the vacant land which First Hartford and Somersville Corporation had the right to purchase. The lease to KMart was part of First Hartford's program to develop the entire parcel into a regional shopping center. The proposed lease is known in shopping development circles as a "built to suit" lease. "Built to suit" leases are the vehicle used in 80–85% of KMart's buildings since the store premises are erected and owned by the landlord and do not, therefore, involve a commitment of KMart's capital.

Between October, 1989 and November, 1990, the parties negotiated extensively before finalizing their agreement. On No-

vember 6, 1990, Ellis, on behalf of First Hartford, executed the lease of the Putnam property that was thereafter signed by KMart on December 5, 1990.

The lease provided in its first article that "Landlord *does demise* unto Tenant and Tenant *does take* from Landlord...." (Emphasis added.) Article one also stated: "Landlord *hereby gives and grants* unto tenant...." (Emphasis added.) The demised premises were described, inter alia, as "land, completed building and site improvements, together with all licenses, rights, privileges and easements, appurtenant thereto."[1] The term of the lease was for twenty-five years with ten five year options to extend the lease for an additional fifty years. The minimum annual rent was $445,367 payable in equal monthly installments on the first day of each month plus an amount equal to 1% of KMart's gross sales from the demised premises in excess of $16,250,000 during a lease year.

Pursuant to the lease, First Hartford was to erect store premises on the parcel and the initial twenty-five year term of the lease and the concomitant obligation to pay rent by KMart would commence upon completion and delivery of the building. The lease provided that KMart's building and site improvements shall "substantially satisfy the provisions of [KMart's] typical store drawings and specifications, prior receipt of which First Hartford hereby acknowledges...." The building and site improvements were to be "completed and delivered to [KMart] promptly and with due diligence." The lease also stated that "rough site grading shall be completed and

foundations and footings commenced not later than *April 1, 1991.*" The lease further provided that "working drawings and specifications shall be submitted to [KMart] in time to permit a review and approval by KMart prior to commencement of construction. *Such approval shall not be unreasonably withheld.*" (Emphasis added.)

The lease also provided: "Anything to the contrary in this lease notwithstanding the covenants contained in this lease to be performed by [First Hartford] shall not be binding personally, but instead said covenants are made for the purpose of binding only the fee simple or leasehold estate which [First Hartford] owns in the demised premises; provided, however, the obligations imposed by Article 8 of this lease shall be personally binding upon [First Hartford].[2]

In an article entitled "Tenant's Right to Cure Landlord's Defaults," the lease provided: "In the event [First Hartford] ... shall fail to perform any obligation specified in this lease, then [KMart] may, after the continuance of any such default for fifteen (15) days after notice thereof by [KMart] .... cure such default, all on behalf of and at the expense of [First Hartford], and do all necessary work and make all necessary payments in connection therewith...." The lease contained no provision that it was contingent upon First Hartford's ability to get financing for the project.

Finally, the lease provided: "The conditions, covenants and agreements contained in this lease shall be binding upon and

---

1. The Lease further provided in this regard: "Landlord hereby gives and grants unto Tenant, in common with others entitled thereto, including Tenant's agents, employees, customers, licensees and invitees the following licenses, rights, privileges and easements: the use of parking areas, common areas (including rest rooms and other facilities, if any), roadways, sidewalks and accessways to public streets and highways indicated on said Exhibit "B", together with the use of any delivery or servicing areas adjoining Tenant's said buildings or designated as such on Exhibit "B", which areas shall be adequate for the passage, unloading and, if necessary, turning around of trailer trucks and other commercial vehicles.

2. Article 8 provided: "[First Hartford] shall unconditionally guarantee all work performed by or for [First Hartford] in the construction of [KMart's] building and site improvements against defective workmanship and materials for a period of one (1) year from commencement of lease term or date of final acceptance by [KMart], whichever is later, unless a different period of time is expressly stated under a section of the criteria documents and/or job specifications. [First Hartford] shall assign to [KMart] any and all guarantees of workmanship and materials which it may receive."

enure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land."

Prior to the lease's execution, Wardlow was aware that First Hartford was having difficulty in securing financing for the Putnam project. Despite this, both First Hartford and KMart executed the lease without reservation, it being understood by all the parties that one of the benefits of executing the lease would be to assist First Hartford in obtaining the financing for the project. Although financing was then difficult to obtain, the nature of the business being what it was, the parties understood that there was never a point when there was absolutely no lender.

On December 11, 1990, shortly after the execution of the lease, Ellis wrote Wardlow and offered to sell KMart the land upon which the store would sit together with the necessary site improvements for $2,750,-000. Because of Ellis' continuing difficulties in obtaining financing for the corporate entity that Ellis would eventually select to be the owner of the Putnam land (in this instance Putnam Parkade, Inc.), it was his desire to restructure the transaction as a so-called "pad sale" in which Putnam Parkade, Inc. would complete all of the site improvements, including the foundation of the proposed store, upon that portion of the project where KMart was to build its store. Putnam Parkade, Inc. would then sell the improved site to KMart which would thereafter build its own store. Ellis expected that recasting the transaction would enhance Putnam Parkade, Inc.'s ability to obtain the necessary mortgage financing to complete the remainder of the project.

KMart, acting through Wardlow, agreed to pursue the "pad sale" and negotiations began anew with the goal of restructuring the transaction in accordance with Ellis' proposal. At no time did either party either orally or in writing give any indication that their earlier lease had been rescinded or extinguished as the result of the new negotiations concerning the "pad sale." As a matter of fact, shortly after proposing the "pad sale" Ellis told Wardlow that such a sale might not be necessary because he was negotiating another deal with respect to the rest of the plaza with the Finast supermarkets chain.

Negotiations and analysis of the proposed site, the site plan improvements, the proposed building and all of the attendant costs continued throughout 1991. Putnam Parkade, Inc., acting through Ellis, represented that it had the financing available for their remaining share of the Putnam project. By October, 1991, KMart had engaged Zan Nicolli of the Michigan law firm of Dickinson, Wright, Moon, Van Dusen & Freeman who thereafter worked with Putnam Parkade, Inc.'s counsel, an Adep, Inc. employee, Petra Deichmann, in the preparation of the agreements required in connection with the restructured transaction.

In early March, 1992, Jeffrey M. Carlson, general counsel to all of the Ellis corporations, approached Steven Winkler, vicepresident and area counsel for Lawyers Title Insurance Co., about issuing title insurance for the Putnam project. Carlson asked Winkler if Lawyers Title would be willing to write a policy of title insurance on the Putnam property and exclude any liens that might be encumbering the property. Carlson and Winkler had several conversations concerning this.

On March 19, 1992, Ellis went to Bentonville, Arkansas, the corporate headquarters for Wal–Mart and there met with Patrick Peery, Wal–Mart's director of real estate for the eastern region. Ellis was a total stranger to Peery, Ellis' business that day being with another Wal–Mart associate in connection with a project that he had previously carried out with Wal–Mart in Lubbock, Texas.

Ellis disclosed to Peery the existence of the Putnam site, described it as being fully permitted and ready to be built upon and offered Wal–Mart a piece of the project. Ellis further disclosed that the premises had been subject to a "build to suit" lease with KMart but that the lease was no longer valid or in effect and had been terminated because of the developer's inability to obtain financing. Peery had previously re-

ceived a copy of KMart's asset redevelopment report and knew that KMart's existing store in downtown Putnam had been approved for relocation. No one at Wal–Mart ever sought a copy of the lease or substantiation of the lease's termination even though they were aware that within the trade there was a document known as a "lease termination agreement." No one at Wal–Mart requested a title opinion or directed that there be an examination of the Putnam land records to determine whether such a lease existed and whether it might affect the title to the land it was purchasing.

At their initial meeting, Ellis described to Peery that he had been trying to restructure the deal as a "pad sale" with KMart and was being frustrated in his attempts to do so. It was during this meeting that Ellis, on behalf of First Hartford and Peery, on behalf of Wal–Mart, struck what is known as a standard joint development agreement whereby Wal–Mart would buy for $4,000,000 a portion of the Putnam project and build its own building and First Hartford would develop the remainder of the tract in accordance with the parties' understanding as to its composition and layout.

On March 20, 1992, Nicolli forwarded to Deichmann all of the "pad sale" documents concerning Putnam Parkade, Inc.'s sale to KMart, now in final form, for execution by Putnam Parkade, Inc. Despite numerous requests, Ellis never returned the documents.

During the second week of April, 1992, a group of senior Wal–Mart executives travelled to Connecticut and inspected the Putnam site. On April 20, 1992, the committee authorized its purchase pursuant to the joint development agreement.

In late April, 1992, Ellis and Peery had a second meeting in Bentonville where the parties reviewed the four basic documents comprising the totality of the Putnam Parkade, Inc.—Wal–Mart agreement. These documents were: 1) a Purchase Agreement; 2) a Development Agreement; 3) a Declaration of Restrictions; and 4) Easements with Covenants and Restrictions Affecting Land.

By May, 1992, Wardlow was now experiencing difficulty in contacting Ellis. On May 5, 1992, having heard rumors that Wal–Mart had "stolen" the site, KMart arranged for the recording of its lease on the Putnam land records.

On May 26, 1992, Ellis gave Carlson a copy of the now recorded memorandum of lease. Carlson immediately telephoned Winkler. Carlson told Winkler that the lease was not effective and they were trying to restructure the deal as a "pad sale" to Wal–Mart. Winkler told Carlson that he was uncomfortable with the situation and asked for a copy of both the lease and the memorandum of lease. Carlson forwarded both to Winkler on the same day.

On May 27, 1992, Winkler consulted with Attorney David Leventhal concerning the legal effect of the recording of the memorandum of lease and the effectiveness of the lease itself. On June 2, 1992, Carlson and Winkler had a meeting at which they discussed the potential ramifications of the recording of the lease. Winkler inquired as to whether Wal–Mart had actual knowledge of the lease's existence. At that time Carlson, on Wal–Mart's behalf, requested Winkler to issue a $1,700,000 policy of title insurance. He requested that the policy issue without condition or exception for the memorandum of lease. Within 48 hours, Winkler notified Carlson that he would issue such a policy without exception for the lease.

By June 14, 1992, Carlson, on behalf of Putnam Parkade, Inc., was dealing directly with Wal–Mart's Michael Davis in connection with the closing of the Putnam property. Carlson did not disclose the existence of the lease nor the recorded memorandum of lease as he was concerned about Wal–Mart's status as a bona fide purchaser and felt that if Wal–Mart had knowledge of the lease, it would at least raise an issue.

On June 22, 1992, Wardlow spoke by telephone with Ellis who told him that the lending source for First Hartford's remaining portion of the project had declined to advance funds. Ellis offered to sell the

entire project to KMart for $6,000,000. Ellis conceded that he had had discussions with Wal–Mart but that "nothing was there." In the meantime, Carlson had put Davis in contact with Winkler of Lawyers Title. Davis thereafter engaged Winkler to represent Wal–Mart at the closing. On June 26, 1992, Davis forwarded specific instructions to Winkler with respect to the closing and the release of $1,762,077 that Wal–Mart would wire transfer to Lawyers Title on June 30, 1992. Winkler did not make any arrangements for an examination of the title to the Putnam premises nor did he elect to tell Wal–Mart of the content of the lease or of the recording of the memorandum of lease.

On June 23, 1992, Carlson saw to the execution of the documents necessary for the formation of the corporation known as Putnam Parkade, Inc. First Hartford paid the fees for the incorporation. The stock of the corporation was owned in its entirety by First Hartford Corporation. Putnam Parkade, Inc. had no employees of its own. Its address and telephone number were the same as First Hartford. Neil Ellis was named as President and Robert Bombardier as Secretary/Treasurer. The two are the sole members of the board of directors.

Bombardier is the comptroller for First Hartford Corporation and works for it and all of its subsidiaries. Like the other employees at 685 Parker Street, his employer is Adeps, Inc.

Ellis never consulted Bombardier in connection with his designation as Secretary/Treasurer or as a director of Putnam Parkade, Inc. Bombardier did not participate in the decision authorizing Putnam Parkade, Inc. to purchase the Putnam property although he was asked to sign the corporate resolution indicating that the corporation had been authorized to acquire the property. He did not participate in the decision designating a statutory agent for service nor did he ever see any of the documentation that was involved in the sale of the Putnam land to Wal–Mart.

On July 1, 1992, Somersville Corporation assigned all the purchase options it held for the property comprising the Putnam site to Putnam Parkade, Inc. Despite the fact that one of the options stood in the name of First Hartford Realty Corporation, Somersville Corporation assigned it to Putnam Parkade, Inc. anyway.

On July 2, 1992, a closing of the Putnam properties took place at the law offices of Kaminsky, Borner & Smith in Putnam. Present were Borner representing the Mosers, owners of the principal parcel comprising the proposed plaza, Carlson representing Putnam Parkade, Inc., Ellis, and Winkler on behalf of Wal–Mart. Also present were various representatives of other landowners. Mechanically, the various parcels were transferred by their respective owners to Putnam Parkade, Inc. which thereafter transferred a portion of the property to Wal–Mart. After the closing Carlson and Winkler went to the Putnam Town Clerk's office and recorded the various deeds. After the July 2 closing, Lawyers Title issued its $1,762,000 title policy in favor of Wal–Mart Stores, Inc. There were no exceptions taken for the KMart lease of the same premises.

At no time did anyone from the Ellis enterprises disclose to KMart that the same property leased to KMart, and all but sold to them, was to be conveyed to Wal–Mart.

On July 3, 1992, Wardlow learned that the site had been transferred to Wal–Mart. This legal action followed.

Based on the foregoing, the court concludes: 1) that a valid and enforceable contract of lease exists between First Hartford and KMart; 2) First Hartford has breached the terms and conditions of the contract of lease by reason of its sale of the premises to Wal–Mart and is, therefore, liable to KMart for the damages flowing from its breach of contract; 3) that Putnam Parkade, Inc., as the alter ego of First Hartford, is similarly liable to KMart; and 4) that Wal–Mart has acquired the Putnam property with actual knowledge of the lease and is, therefore, also liable to KMart.

## I

The defendants have alleged a series of affirmative defenses in support of their claim that the lease agreement is not valid and enforceable. The gravamen of these special defenses is that the instrument executed by KMart and First Hartford never ripened into a contract, or, in the alternative, if it were a contract, it's covenants have become unenforceable. Further, the defendants claim that the lease agreement does not comply with Connecticut's statute of frauds.

■ The defendants first claim that lease was not an enforceable contract because: (1) it lacked mutuality of obligation; and (2) there was no meeting of the minds. The defendants argue that the "lease" was merely an offer to enter a lease by KMart that First Hartford could accept by complying with the agreement's terms. The defendants argue that the purported agreement did not impose any present, concurrent obligations upon KMart and therefore no contract existed. Examination of the lease discloses that First Hartford agreed, inter alia: (1) to demise the premises to KMart; (2) to promptly erect a building and complete the site improvements in accordance with approved drawings and specifications; and (3) to deliver peaceable possession of the premises to KMart. KMart simultaneously agreed, inter alia: (1) to act in good faith in approving the building's plans and specifications and not to unreasonably withhold approval; (2) to pay the rent; and (3) to maintain the premises in good repair. It is evident that were KMart to have unreasonably delayed the approval of the plans and specifications or otherwise not acted in good faith in connection with the plans' approval, First Hartford would have had an enforceable right under the contract as of the instant the document was signed. To claim that there were not mutual promises is simply inconsistent with the plain language of the agreement.

■ The defendants next claim that the lease agreement was not an enforceable contract because KMart and First Hartford never intended it as such, but rather intended it only as a vehicle to assist First Hartford in obtaining mortgage financing for the Putnam project. "The making of a contract does not depend upon the secret intention of a party but upon the intention manifested [by the plain language of the agreement]." *Nutmeg State Machinery Corp. v. Shuford,* 129 Conn. 659, 661, 30 A.2d 911 (1943). It is true that Wardlow and, therefore, KMart knew that financing was unavailable at the time of the lease's execution. Both parties executed the lease in full recognition of the fact that its existence would enhance First Hartford's ability to obtain financing. The lease contained no provision, however, as it well could have, that its efficacy was contingent upon the lessor's ability to obtain financing to erect the building. Were it the parties' intention that the agreement was simply a device to obtain mortgage financing, sophisticated businessmen such as these obviously would have included a mortgage contingency clause. The court concludes that the defendants have simply not proven that the parties intended their agreement to act only as a device to secure financing and not as a presently enforceable contract of lease.

■ The defendants next claim that First Hartford's lack of an interest in the land at the time of the lease's execution prevented it from transferring a valid leasehold interest real property to KMart.

Two Connecticut holdings are applicable to this issue. First, a landlord's lack of title will not defeat an otherwise valid lease provided the landlord acquires title to the property prior to the commencement of the tenancy. *Murphy v. Schwaner,* 84 Conn. 420, 80 A. 295 (1911). Second, "[w]here one without title has conveyed with covenants of warranty, and has afterwards acquired title, he is estopped from asserting his want of title at the time of his making such first conveyance." *Wheeler v. Young,* 76 Conn. 44, 55 A. 670 (1903). The doctrine of estoppel by deed applies to the grantor of the property as well as those in privity with him. *Zandri v. Tendler,* 123 Conn. 117, 122, 193 A. 598 (1937).

Article 27 of the lease provided that "[l]andlord further covenants ... that prior

to commencement of construction ... it shall be seized of an indefeasible estate in fee simple or shall have good and marketable leasehold title to the land." First Hartford did acquire title to said property at the direction of Ellis, through its alter ego, Putnam Parkade, Inc. *Murphy* and *Wheeler*, therefore, mandates the conclusion that the lease is valid as to both First Hartford and KMart. Further, because Wal–Mart was in privity with First Hartford by reason of its purchase of the property from its alter ego, Putnam Parkade, Inc., *Wheeler* and *Zandri* compel the conclusion that Wal–Mart is estopped from denying the validity of First Hartford's title.

The defendants next claim that even if there were a valid contract, a series of conditions precedent to First Hartford's obligation to perform never occurred and, therefore, First Hartford's obligations under the lease were excused. The alleged conditions precedent that failed included: (a) First Hartford's failure to obtain mortgage financing; (b) KMart's failure to agree to necessary plans and specifications for the building and site improvements; (c) First Hartford's failure to acquire title to the premises prior to September 1, 1991; and (d) First Hartford's failure to construct the balance of the regional shopping center and to secure the presence of a food store as an anchor tenant.

█ If a condition precedent "is not fulfilled, the right to enforce the contract does not come into existence. A condition precedent is a fact or event that the parties intend must exist or take place before there is a right to performance. Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties as expressed in the contract and read in light of the circumstances surrounding the execution of the instrument." *Christophersen v. Blount*, 216 Conn. 509, 512, 582 A.2d 460 (1990) (quotations omitted) (citations omitted).

█ In this case, as previously discussed, the evidence indicates that KMart and First Hartford, through their concurrent, immediately enforceable undertak-ings, intended a contract, and that the so-called "conditions precedent" to the lease agreement were in fact nothing more than mutual promises of the contracting parties to perform certain acts in the future. To claim that a contract is unenforceable because there remains at a given time, certain obligations characterized as "conditions precedent," the failure of which renders a contract unenforceable, would be tantamount to saying that the contract would never be enforceable.

As previously noted, mortgage financing was not a contingency. Had it been, parties such as these would have specifically so provided in their agreement. The plans and specifications were held in abeyance pursuant to the parties' mutual agreement to pursue alternative means of proceeding with the project, i.e., the "pad sale." Failure to acquire title by September 1, 1991 was not the only provision in the lease dealing with this issue. The lease provided that prior to construction of the building that First Hartford would have title to the premises. The agreement also provided that First Hartford would have up to seven years to erect the building. Finally, the court is unable to conclude as a matter of fact, that given the opportunity to allow the conditions of the lease agreement to unfold in the manner originally contemplated by the parties, that First Hartford would not have been able to complete the shopping plaza as agreed including the presence of the food store.

█ The defendants next claim that the purported lease does not satisfy the statute of frauds because KMart and First Hartford had not agreed to the exact plans and specifications for the proposed store at the time of the lease's execution. The Connecticut statute of frauds requires that a lease for more than one year contain the names of the parties, "a description of the property let, the term of the lease and the amount of the rent.... It should also contain the terms of payment of rent." *Handy v. Barclay*, 98 Conn. 290, 292, 119 A. 227 (1922). The purpose of the statute of frauds is to prevent fraudulent claims, not to prevent the enforcement of valid written agree-

ment. *Lynch v. Davis*, 181 Conn. 434, 440–41, 435 A.2d 977 (1980). "[A] memorandum is sufficient, even though it does not recite the underlying contract in its entirety, if it provides reliable written evidence that the parties have come to a complete agreement." *Id.* at 440, 435 A.2d 977.

The KMart/First Hartford lease was self-described as a "lease," it contained the names of the parties, a description of the property on which First Hartford was to construct the KMart building, the term of the lease, and the amount and payment terms of the rent. The lease further provided that First Hartford would submit building plans that "substantially satisfy the provisions of [KMart's] typical store drawings and specifications, prior receipt of which [First Hartford] acknowledges" for the approval of KMart. The lease expressly provided that KMart could not unreasonably withhold its approval of the plans. The lease further provided that the plans and specifications would be self-approving if KMart did not reject them within sixty days after their submission.

The court finds that the language in the lease established a clear mechanism by which the working plans were to be developed and approved. There is no evidence that the mechanism as described was incapable of producing a final set of plans and specifications. Rather, the parties simply held the process in abeyance while pursuing an alternative method of developing the property. The court concludes, therefore, that such language provides sufficient written evidence of a complete agreement.

The defendants next argue that even if originally valid, the lease subsequently became unenforceable because: (1) the parties mutually agreed through their conduct that the lease was to be abandoned or rescinded; and (2) First Hartford's inability to obtain financing constituted a frustration of the lease's purpose.[3]

■ The defendants base their claim of abandonment or rescission on KMart's act of negotiating for the "pad sale" and its allowance of the September 1, 1991 construction deadline to pass without objection. To determine whether the parties have abandoned or rescinded a contract, the court must determine the intent of the parties through examination of their words and actions. *Yale Co-operative Corp. v. Rogin*, 133 Conn. 563, 568, 53 A.2d 383 (1947). KMart's June 14, 1991 letter to First Hartford clearly implies that the negotiations for the "pad sale" did not affect the enforceability of the lease. First Hartford never disavowed this assertion. At no time during the subsequent negotiations for the "pad sale" did either party indicate that it wished to rescind or abandon the lease.

■ The defendants further claim that First Hartford's failure to obtain financing constituted a frustration of the lease's purpose. The doctrine of frustration of purpose applies when objectives of a contract are "utterly" defeated by supervening events. *Hess v. Dumouchel Paper*, 154 Conn. 343, 350–51, 225 A.2d 797 (1966). Assuming that the procurement of financing was an objective of the contract, the court finds that the defendants have failed to prove that First Hartford exhausted all opportunities to obtain financing. To the contrary, the court has found that "the nature of the business being what it was, the parties understood that there was never a point when there was absolutely no lender." The court concludes that the doctrine of frustration of purpose does not apply in this instance.

■ The defendants next claim that the KMart/First Hartford "lease" was not a true lease but rather an agreement for a lease. In *In re Wonderfair Stores, Inc. of Arizona*, 511 F.2d 1206 (9th Cir.1975), the court examined a lease, very similar to the one at bar, which provided that the landlord would construct a building on a portion of a proposed shopping mall site according to the tenant's specifications and to

---

**3.** The defendants also contend that KMart should be estopped from asserting the validity of the lease because KMart represented to First Hartford that the lease was merely to be used as a vehicle to enable First Hartford to obtain financing. The court has earlier concluded that this claim has not been proven by a fair preponderance of the evidence.

the tenant's satisfaction. The landlord's trustee in bankruptcy argued that the lease was actually an agreement for lease, and therefore that it was unenforceable. The *Wonderfair* court, noting that the "controlling consideration in determining whether an instrument is a present demise or merely an agreement to lease is the intention of the parties," held that the parties had intended to enter a lease because: (1) the purported lease contained language using the present tense ("hereby leases"); (2) the lease contained a provision that gave the tenant a possessory interest in the land itself ("[the tenant may] enter upon the land and perform any act or acts required of [the landlord] and which [the landlord] has failed to perform for thirty days after receipt of notice from [the tenant]"); and (3) the lease provision stating that the lease covenants ran with the land did not postpone their running until the completion of the building, and therefore, granted the tenant a present property interest in the land. *Id.* at 1211.

Like the *Wonderfair* lease, the KMart/First Hartford lease contained: (1) language of present demise ("Landlord does demise and Tenant does take from landlord for the lease term"; "Landlord hereby gives and grants unto Tenant"); (2) a provision granting the tenant a possessory interest in the land itself; and (3) a provision stating that the covenants run with the land which provision did not postpone their running until the completion of the building.

## II

 "Generally, a corporation is a distinct legal entity and the stockholders [or other related corporations] are not personally liable for the acts and obligations of the corporation. 18 Am.Jur.2d, Corporations § 13; 19 Am.Jur.2d, op. cit. § 713. Courts will ... disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor. 1 Fletcher, Corporations, Corporations (Perm.Ed.1963 Rev.) § 43; Ballantine, Corporations (Rev.Ed.) § 136; 18 Am.Jur.2d, Corporations § 14". *Saphir v. Neustadt,* 177 Conn. 191, 209, 413 A.2d 843 (1979).

In *Zaist v. Olson,* 154 Conn. 563, 227 A.2d 552 (1967), the Connecticut Supreme Court found a related corporation liable under an "alter ego" theory, concluding that the corporate structure of the defendant in that case could properly have been disregarded under either the "instrumentality" rule or the "identity" rule.

"The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. (Citations omitted.)

"Complementing the instrumentality rule is the identity rule.... The proposition has been otherwise expressed as follows: 'If plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.' *Mull v. Colt Co.,* 31 F.R.D. 154, 163 (S.D.N.Y.); *Walkovszky v. Carlton,* 24 App.Div.2d 582, 583, 262 N.Y.S.2d 334." *Zaist v. Olson,* supra, 575–76, 227 A.2d 552.

 In the present case Putnam Parkade, Inc. is a corporation organized solely for the purpose of purchasing the property

**1328**

that is the subject of the present dispute. Putnam Parkade was initially a department of First Hartford Realty Corporation as that fact was reflected on its books. Ellis singlehandedly directs the operations of both corporations. The two corporations share the same staff, office space, telephone lines, computers, copiers and other administrative support. The finances of the two corporations and the other Ellis enterprises are thoroughly intermingled. Indeed, in connection with this transaction, there was no consideration paid by Putnam Parkade, Inc. to either Somersville Corporation or First Hartford for the options that they held on the Putnam property nor were there any debt instruments authorized or prepared in connection with the transfers of these options to Putnam Parkade, Inc. There was no independent judgment exercised by Bombardier, the other officer and director of Putnam Parkade, Inc. in connection with these real estate transfers, the entire transaction having been orchestrated by Ellis.

The entire transaction was totally dominated by Ellis. The corporate entity, Putnam Parkade, Inc. in this instance, had no separate mind or will of its own. There were no consultations or discussions between Ellis and Bombardier, the principals of Putnam Parkade, Inc., before the determination was made that this corporation would buy the Putnam parcel and immediately sell a portion of it to Wal–Mart. The designation by Ellis of Putnam Parkade, Inc. to receive the property and Putnam Parkade, Inc.'s subsequent sale of a portion of it to Wal–Mart clearly breached the terms of the earlier lease between KMart and First Hartford, thereby depriving KMart of the legal rights that it held pursuant to the terms of the lease. Finally, Ellis' manipulation of these corporations was unquestionably the proximate cause of the loss of KMart's interest in the lease and the losses and damages that will hereafter follow. The court concludes that adherence to the fiction of a separate identity between First Hartford and Putnam Parkade, Inc. would serve only to defeat justice and equity by permitting Putnam Parkade, Inc., the economic entity deriving

the benefits of the acquisition of this parcel and the subsequent sale of a portion of it to Wal–Mart, to escape the obligations undertaken by First Hartford by the earlier lease to KMart. The court concludes that it is necessary, therefore, to treat the two entities each as alter egos of the other in order to effect a proper disposition of the matter.

■ It must be emphasized, however, that "[t]he practice of disregarding the corporate entity should be undertaken with great caution. This principle is fully applicable in situations where the corporation is dominated by a single individual." *Zaist v. Olson*, 154 Conn. 563, 581, 227 A.2d 552 (1967). In the present instance, it would be neither equitable nor legally correct to pierce the corporate veil and find Ellis personally liable for any delict that has in fact occurred. KMart freely chose to deal with a corporate entity without the benefit of personal guarantees. In fact, the parties specifically limited the liability flowing from the contract of lease by providing in the lease that "the covenants contained in this lease ... shall not be binding personally, but instead said covenants are made for the purpose of binding only the fee simple or leasehold estate."

### III

■ The defendant Wal–Mart next claims that assuming arguendo that First Hartford and Putnam Parkade, Inc. are the same entity as a matter of law, Wal–Mart is still a bona fide purchaser because it acquired the property in good faith, for value and without notice of the continuing viability of the KMart lease. The plaintiff argues that Wal–Mart is not entitled to the protection afforded a bona fide purchaser because it knew of the existence of the lease and failed to conduct a reasonable investigation into the present validity of the lease.

It is undisputed that Wal–Mart had actual notice of the lease. Ellis told Perry that the lease existed. It is also undisputed that Winkler, counsel from Lawyers Title, had actual notice of the recording of the lease and had in his possession a copy of

the lease itself. The only issue is whether Wal–Mart knew or should have known of the continued validity of the lease.

The court concludes that Wal–Mart is chargeable with actual notice of the efficacy of the lease for the following two reasons, either one of which is sufficient to establish actual notice: (1) the actual knowledge of the lease's continued effectiveness held by Wal–Mart's agent, Winkler, is chargeable to Wal–Mart as principal; and (2) Wal–Mart's actual knowledge of the existence of the lease, if investigated with reasonable diligence, would have uncovered the true nature of KMart's interest in the land.

 Although Wal–Mart claims that Lawyers Title never informed it of the memorandum of lease, which was recorded two months before Wal–Mart purchased the property, such knowledge may be imputed to Wal–Mart through principles of agency. "[N]otice to, or knowledge of, an agent while acting within the scope of its authority and reference to a matter over which his authority extends, is notice to, or knowledge of, the principal." *West Haven v. United States Fidelity & Guaranty Co.,* 174 Conn. 392, 395, 389 A.2d 741 (1978). Agency is a "fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act...." *McLaughlin v. Chicken Delight, Inc.,* 164 Conn. 317, 322, 321 A.2d 456 (1973); *Beckenstein v. Potter & Carrier, Inc.,* 191 Conn. 120, 132, 464 A.2d 6 (1983). Three elements required to show an agency relationship are: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertakings. *Beckenstein,* supra, 133, 464 A.2d 6; 1 Restatement (Second) Agency § 1, comment b.

In March, 1992, Carlson, general counsel to the Ellis enterprises, asked Winkler to investigate the possibility of procuring a title insurance policy for Wal–Mart. On June 2, 1992, Carlson, on Wal–Mart's be-half, requested Winkler to issue a $1,700,-000 policy of title insurance without condition or exception for the memorandum of lease. In late June, 1992, Wal–Mart engaged Winkler to act as its agent in connection with the proposed closing. On July 2, 1992, Winkler represented Wal–Mart at the closing and, through Lawyers Title issued the title insurance policy to Wal–Mart.

Although Wal–Mart argues that Winkler's knowledge is not attributable to it because the scope of his undertaking was limited, the facts disclose otherwise.

 Winkler testified that the services that he performed for Wal–Mart were the same as he would have performed had he been their attorney. Wal–Mart delegated all title issues to Winkler. Winkler consulted with Carlson on the specific issue of the status of the title. He consulted with Davis. He reviewed the closing documents. He attended the closing, received and exchanged the necessary instruments, and disbursed the funds. He thereafter went to the Putnam land records and examined the day book, and saw to the recording of the various documents necessary to pass title to Wal–Mart. Having delegated all the title issues to Winkler, and having directed him to act as their de facto attorney throughout the transaction, the court concludes that Winkler's actual knowledge of the content of the lease must be imputed to Wal–Mart.

Wal–Mart next claims that it was entitled to rely on Ellis' representation that the lease was no longer valid and that, in any event, its efforts to investigate the nature of KMart's interest in the land were reasonable. The court disagrees.

 "[O]ne who purchases land with actual notice of ... documents affecting title to it buys subject to any rights created by them in others.... [T]he purchaser has such notice if he knows 'facts which are sufficient to put a prudent man on inquiry, which, if prosecuted with reasonable diligence, would certainly lead to discovery of a conflicting claim.'" *Diotautio v. Puskas,* 134 Conn. 349, 352–353, 57 A.2d 726 (1948) (quoting *Lengyel v. Peregrin,* 104

Conn. 285, 288, 132 A. 459 (1926); *see also Andretta v. Fox New England Theatres, Inc.*, 113 Conn. 476, 480, 155 A. 848 (1931); *Drazen Properties Ltd. Partnership v. E.F. Mahon, Inc.*, 19 Conn.App. 471, 477, 562 A.2d 1142 (1989); *North Street Assocs. v. Watstein & Watstein, P.C.*, 3 Conn. L.Rptr. 225–226, 1990 WL 265219 (1990).[4]

■ Wal–Mart's reliance on Ellis' representation that the lease was no longer valid or effective cannot be considered reasonably diligent investigation. *North Street Assocs. v. Watstein & Watstein, P.C.*, 3 Conn.L.Rptr. 225, 227, 1990 WL 265219 (1990). *IK Corp. v. One Financial Place Partnership*, 200 Ill.App.3d 802, 146 Ill. Dec. 198, 208, 558 N.E.2d 161, 171 (1990). A simple independent review of the lease would have revealed that the automatic termination provision had not become operative because seven years had not yet elapsed and that KMart still had the right to cure the landlord's default by constructing a building itself and then charging the landlord for its costs. Further, Wal–Mart failed to ask Ellis for a copy of the "lease termination agreement," an instrument known to them as members of the trade, which would have substantiated, if it had existed, that the lease had been terminated. Additionally, Peery knew of KMart's plan to relocate its existing, older Putnam store.

Moreover, Wal–Mart's knowledge of KMart's negotiations for a "pad sale" clearly informed Wal–Mart that KMart was still interested in the property. As KMart argues, it is reasonable to assume that Wal–Mart should have been aware, or at least suspicious, that KMart would have protected its interest by *not* terminating the lease until the "pad sale" negotiations had been completed. Again, the lack of a "lease termination agreement" should have indicated to Wal–Mart that the "pad sale" discussions were only an alternative option for KMart.

Further, although Wal–Mart claims that its physical inspection of the site did not reveal indications of a prior right or interest in the property by another party, this argument constitutes no more than an "after the fact" rationalization constructed after the most obvious modes of investigation have been negligently omitted or purposely avoided. While it is true that in some cases a site inspection can yield reliable clues to the existence of a competing claim, here it did not. The court concludes that a reasonably prudent person would not have put much value on the results of the site inspection in this case. In sum, there were many simple methods to determine the nature of KMart's property interest that Wal–Mart either neglected to pursue or consciously ignored and, therefore, it cannot be considered a bona fide purchaser of the land.[5]

### IV

While the court concludes that the KMart/First Hartford lease is valid and enforceable and that Wal–Mart purchased

4. Wal–Mart contends that actual notice must be proved by clear and convincing evidence. Without reaching this issue, the court nevertheless concludes that actual notice has been established by that standard of review.

5. Although Wal–Mart spends a considerable amount of time arguing that KMart improperly recorded its lease and that, therefore, Wal–Mart did not have constructive notice of the lease, the court has not recited the facts pertinent to this issue because it is irrelevant to the disposition of the case. It is well established that even where constructive notice cannot be established because of a defective deed or improper recording, actual notice, if established, is sufficient to destroy one's ability to achieve bona fide purchaser status. *Sumner v. Rhodes,* 14 Conn. 135, 139 (1840). Recorded instruments that do not afford constructive notice because they are outside the chain of title, are nevertheless effective against subsequent parties who acquire actual notice of their existence. Connecticut Standards of Title, Standard 2.3, comment 6 (1980). The essential element of a good faith purchaser is the absence of notice or knowledge, whether actual or constructive, of the outstanding unrecorded rights of others in and to the property in question. Connecticut Standards of Title, Standard 2.7, comment 2 (1980). Wal–Mart cannot rely on the formalities of the recording system to protect itself when it knew or could easily have discovered that the lease was still valid.

the Putnam property with actual notice of the lease, the court declines to order the equitable relief sought by KMart.[6]

 A basic principle of equity is that equitable remedies will not be awarded where the plaintiff has an adequate remedy at law. *See Cahill v. Board of Education of the City of Stamford,* 187 Conn. 94, 98, 444 A.2d 907 (1982). KMart's expert, Robert F. Kennedy, testified that the harm to KMart resulting from the construction and operation of a new Wal–Mart store on the Putnam site would be that KMart could not open a profitable, comparably sized store in the same market area and that the Wal–Mart store would take profits away from the existing KMart store. He further testified that the value of this injury is capable of being quantified in dollars and that enough information exists to determine these damages. The court concludes, therefore, that the plaintiff has an adequate remedy at law by way of a claim for dollar damages for breach of contract. Since there is an adequate remedy at law, the court declines to enter any equitable orders.

### V

The plaintiff claims that the defendants' actions constitute fraud, tortious interference, and violations of the Connecticut Unfair Practices Act (CUTPA), *see* Conn.Gen. Stat. § 42–110a et seq. The court has examined the evidence with respect to each of these claims and finds the same either not to have been proven by a fair preponderance of the evidence or not established as a matter of law.

The plaintiff is authorized a prejudgment remedy to the value of $4,000,000 by way of a certificate of attachment to be lodged with the Putnam town clerk, encumbering the real and personal property of the defen-

dants First Hartford, Putnam Parkade, Inc. and Wal–Mart in the Town of Putnam.[7]

SO ORDERED.

---

6. KMart requests the court to set aside the deed from Putnam Parkade, Inc. to Wal–Mart, to order specific performance of the lease, and to order the defendants to refrain from interfering with the lease.

7. See Conn. General Statutes §§ 52–278a et seq. and 52–279.