# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-2060

FUTURESOURCE LLC,

*Plaintiff-Appellee,*

v.

REUTERS LIMITED; REUTERS S.A.;
and REUTERS AMERICA INC.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 2073—**Elaine E. Bucklo,** *Judge.*

ARGUED OCTOBER 18, 2002—DECIDED NOVEMBER 27, 2002

Before POSNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

POSNER, *Circuit Judge.* The defendants in this diversity suit for breach of contract and tortious interference with contract (affiliated corporations that we'll call "Reuters") appeal from the grant of a preliminary injunction to the plaintiff, FutureSource. The appeal raises issues of copyright and bankruptcy law, as well as of the common law of Illinois—actually there's no discussion of choice of law issues, and so we apply the law of the forum state. We note preliminarily that the district court based its decision entirely on an unreported district court decision from

another circuit, that FutureSource places great reliance on that decision, and that Reuters is at pains to distinguish it. The reasoning of district judges is of course entitled to respect, but the decision of a district judge cannot be a controlling precedent. E.g., *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987); *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995). The law's coherence could not be maintained if district courts were deemed to make law for their circuit, let alone for the nation, since district courts do not have circuit-wide or nationwide jurisdiction.

The facts of this case are not in dispute; simplified, they are as follows. The Reuters news service provides news and financial information to paying subscribers, such as newspapers. Bridge Information Services was, and FutureSource is, a competitor of Reuters. In 1999, Future-Source made a contract with Bridge, the "Intercompany Service Agreement" (ISA), under which, in exchange for royalties of roughly $1.5 million a year, Bridge agreed to furnish FutureSource with continuously updated, consolidated, rearranged, and reformatted financial-markets data for resale to FutureSource's customers, and also with the software necessary to download the data. The agreement was to remain in force essentially as long as Future-Source wanted it to.

Two years after the making of the Intercompany Service Agreement, Bridge filed for bankruptcy. The bankruptcy court conducted an auction of Bridge's assets at which Reuters bought the assets used in Bridge's financial-markets data service for $275 million, pursuant to an asset purchase agreement between the parties. The agreement provided that Reuters was assuming no contractual or other obligations of Bridge other than those specified. Bridge's obligations under the Interservice Company Agreement were not among those specified; and in its order approving

the sale the bankruptcy court stated that Reuters was taking the Bridge assets free and clear of all "liens, claims, interests and encumbrances." FutureSource was not a party to the bankruptcy proceeding, but it was what is called "a party in interest," which is "anyone holding a direct financial stake in the outcome of the [bankruptcy] case," 7 *Collier on Bankruptcy* ¶ 1109.01[1], p. 1109-4 (15th ed. 2002), and as such it had a right to "raise and . . . appear and be heard on any issue" in the case. 11 U.S.C. § 1109(b). The right would not have been worth much to FutureSource had it not known about the auction or the asset purchase agreement, but it was notified of both and had access to a copy of the agreement yet it did not object to the sale or challenge the bankruptcy court's order. The asset purchase agreement specified that one of the assets to be sold to Reuters was the intellectual property of Bridge used in the provision of the data service that Reuters was buying.

Among the assets of Bridge that were *not* bought by Reuters (or by anyone else) at the auction were the rights conferred on Bridge by the Intercompany Service Agreement, including the right to receive royalties from Future-Source in exchange for providing the service that the agreement required Bridge to provide to that company. At a subsequent stage in the bankruptcy proceeding those assets were sold to another company, Moneyline Network, as part of an assignment of the agreement to that company. So Moneyline became the obligee of Future-Source's royalty obligation under the ISA to Bridge and the obligor of Bridge's service obligation to FutureSource. Moneyline assured the bankruptcy court that it would perform its obligations to FutureSource under the agreement, but apparently it has not done so and, as far as we know, FutureSource is not paying Moneyline the royalties called for by the agreement—understandably, if it's receiving no services from Moneyline.

FutureSource brought this suit to compel Reuters to continue providing the service that Bridge provided to FutureSource under the Intercompany Service Agreement. FutureSource also argues that Reuters interfered tortiously with FutureSource's contracts with FutureSource's own customers by telling them that Reuters was terminating the Bridge service (which, remember, FutureSource had been reselling to them). But this claim fails if Reuters was telling them truthfully that it was merely exercising a legal right. *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 10-11 (Ill. App. 1995); *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 172-73 (7th Cir. 1993) (Illinois law); *George A. Fuller Co. v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326, 1332 (7th Cir. 1983) (same); *Worldwide Primates, Inc. v. McGreal*, 26 F.3d 1089, 1092 (11th Cir. 1994); *Allen v. Safeway Stores Inc.*, 699 P.2d 277, 279-80 (Wyo. 1985); *Restatement (Second) of Torts* § 772(a) (1979). So all that has to be decided is whether Reuters is obligated to furnish the Bridge data service to FutureSource free of charge until the end of time.

Nonsensical interpretations of contracts, as of statutes, are disfavored. *Level 3 Communications, Inc. v. Federal Ins. Co.*, 168 F.3d 956, 958 (7th Cir. 1999); *Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703, 711-12 (7th Cir. 1999); *Outlet Embroidery Co. v. Derwent Mills*, 172 N.E. 462, 463 (1930) (Cardozo, C.J.); see also *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 453-54 (1989); *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 527 (1989) (Scalia, J., concurring). Not because of a judicial aversion to nonsense as such, but because people are unlikely to make contracts, or legislators statutes, that they believe will have absurd consequences. This principle is apt to the present case. Even though the Intercompany Service Agreement, the source of FutureSource's claim, required FutureSource to pay annual royalties of $1.5 million to continue receiving the Bridge data service, FutureSource intends to pay

nothing at all for the service—not to Reuters, with which it has no contract, and probably not to Moneyline, from which it apparently is receiving no service. FutureSource does not and cannot contend that it provided anything of value to Reuters in exchange for the gift of a lifetime of free data service; it has provided nothing at all (except for an interim period during which the parties were negotiating, ultimately unsuccessfully, to settle their dispute). It would be a serious indictment of American law if somehow contract, copyright, and bankruptcy law combined, like an explosive mixture of innocuous chemicals, to produce the result for which FutureSource contends.

We are not altogether certain that FutureSource is not paying and will not pay Moneyline, but its position would be hardly more sensible if it acknowledged an obligation to pay Moneyline for services received from Reuters. Moneyline would be receiving payment for nothing, and Reuters would be rendering valuable services for nothing.

The argument that FutureSource makes on behalf of these results is that the Intercompany Service Agreement gave it a license to use Bridge's intellectual property and that an intellectual-property license, like a tenancy in real estate, is not extinguished by the sale of the underlying property. This is true in general; and we may further assume that the contract did convey to FutureSource an interest in intellectual property. Although data are not copyrightable, compilations of data that involve a significant element of creativity are, *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 348, 358-59 (1991); 17 U.S.C. §§ 101, 103, and for all we know that is the character of the Bridge data service, on which Bridge owns a copyright the validity of which is not challenged. No matter. The bankruptcy court's sale order, consistent with 11 U.S.C. § 363(f), extinguished all "interests" in the assets acquired

by Reuters, and this included an interest in the intellectual property that Reuters acquired from Bridge. Although the statute does not define "interest," leaseholds are an interest, e.g., *In re Downtown Athletic Club*, No. M-47 (JSM), 2000 WL 744126, at *4 (S.D.N.Y. 2000); *In re Taylor*, 198 B.R. 142, 161-62 (Bankr. D.S.C. 1996), and leaseholds are FutureSource's own chosen analogy to Bridge's license. It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. E.g., *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994); *In re Elliot*, 94 B.R. 343, 345-46 (Bankr. E.D. Pa. 1988); see also *Veltman v. Whetzal*, 93 F.3d 517, 520 (8th Cir. 1996); contra, see *In re Roberts*, 249 B.R. 152, 154-57 (Bankr. W.D. Mich. 2000). It could not be otherwise; transaction costs would be prohibitive if everyone who *might* have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.

And in any event the order approving a bankruptcy sale is a judicial order and can be attacked collaterally only within the tight limits that Fed. R. Civ. P. 60(b) imposes on collateral attacks on civil judgments. *In re Edwards*, 962 F.2d 641, 643-44 (7th Cir. 1992); *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 908 (7th Cir. 1990); *In re Met-L-Wood Corp.*, 861 F.2d 1012, 1016, 1017-18 (7th Cir. 1988). FutureSource has made no effort to bring itself within those limits; and now that more than a year has passed since the order was issued, it is doubtful, to say the least, that FutureSource could succeed in such a collateral attack.

There is an independently fatal flaw in FutureSource's position. It fails to distinguish between property that does and property that does not exist. Suppose a builder prom-

ises to lease to someone space in a building that the builder is planning to build. That is a promise to create a leasehold; it is not a leasehold, that is, an interest in real estate (an "estate in land," as it used to be called)—there is no real estate. *Target Stores, Inc. v. Twin Plaza Co.*, 153 N.W.2d 832, 840-41 (Minn. 1967); *Wright v. Baumann*, 398 P.2d 119, 122 (Ore. 1965). It is true that *In re Wonderfair Stores, Inc. of Arizona*, 511 F.2d 1206, 1210-12 (9th Cir. 1975), and *Kmart Corp. v. First Hartford Realty Corp.*, 810 F. Supp. 1316, 1326-27 (D. Conn. 1993), seem contrary (though recall our opening remarks about the precedential significance of district court decisions). But *Wonderfair* involved uncompleted rather than nonexistent buildings, and in both cases the lease covered land, which of course did exist, as well as structures. The legal understandings that distinguish a lease from an ordinary contract have reference to existing property, improved or unimproved, owned by one party and occupied (or to be occupied) by the other.

In the Intercompany Service Agreement, Bridge merely promised to license to FutureSource data specified in the contract as and when those data were created. If as we greatly doubt the license was not extinguished by the bankruptcy sale, all this means is that FutureSource remains free to use the data that it acquired from Bridge (stale data having little, maybe no, current value). Its contractual rights under the ISA, including the right to receive licenses of future data, run against Moneyline, by virtue of Moneyline's purchase of the ISA. FutureSource has no contractual rights against Reuters, with which it has no contract; and it has no license in data that Bridge-Reuters has not yet created.

FutureSource argues that if the agreement is deemed an executory contract to grant it future licenses (executory because the duty to perform had not yet materialized), the contract survived the bankruptcy sale because it was not

rejected by the trustee. 11 U.S.C. § 365(a); *In re Midway Airlines, Inc.*, 6 F.3d 492, 494 (7th Cir. 1993). (Since, for these purposes, an unexpired lease is, with respect to its unexpired portion, a contract, *In re Boston Post Road Ltd. Partnership*, 21 F.3d 477, 484 (2d Cir. 1994), FutureSource's argument is actually independent of whether the Intercompany Service Agreement created an interest that is the legal equivalent of a leasehold.) Of course the agreement was not rejected—it was assigned to Moneyline. Any rights that FutureSource has under it are, as a result of the assignment, rights against Moneyline, not against Reuters. The agreement did not forbid assignment, and even if it had forbidden it the bankruptcy court would not have been bound. 11 U.S.C. § 365(f)(1); *In re Midway Airlines, Inc.*, *supra*, 6 F.3d at 495-96; *In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1993); Douglas G. Baird, *The Elements of Bankruptcy* 124-25 (3d ed. 2001).

Obviously a preliminary injunction should not be entered if the plaintiff has no claim; and FutureSource has none. The next step in the district court presumably will be the filing of a motion for summary judgment by Reuters and its grant by the district judge. But we decline to anticipate the judge's ruling on such a motion (and have not been asked to do so).

REVERSED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*