610 A.2d 791

**METROMEDIA COMPANY**

v.

**WCBM MARYLAND, INC. et al.**

**No. 136, Sept. Term, 1991.**

Court of Appeals of Maryland.

Aug. 24, 1992.

Motion for Reconsideration Denied
Oct. 2, 1992.

Lawrence S. Greenwald (Charles S. Hirsch, Gordon, Fein-blatt, Rothman, Hoffberger & Hollander, on brief), Balti-more, for petitioner.

Edward C. Covahey, Jr. and Anthony J. DiPaula (Covahey & Boozer, P.A., on brief) Towson, for respondents.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and BELL, JJ.

KARWACKI, Judge.

We issued a writ of certiorari to consider the question of whether under the circumstances of this case an officer of a corporation, which is alleged to be unlawfully occupying improved real property, may be held personally liable for damages in an ejectment action brought by the owner.

## I.

Prior to February of 1987, Metromedia Company (Me-tromedia) was the sublessee of approximately 40 acres of improved real estate located in Owings Mills, Maryland (the Premises). It operated radio station WCBM–AM from that location. On February 26, 1987, Metromedia executed an agreement with Magic 680, Inc. (Magic 680) for the sale of the station with its operating equipment and for the sub-subleasing of the Premises to Magic 680. Magic 680 subsequently defaulted on its obligations to Metromedia. Because of that default, Metromedia re-entered the Premises and repossessed the radio station equipment. A receiver

was appointed by the Circuit Court for Baltimore County to preserve the assets of Magic 680 for satisfaction of the claims of Metromedia and its other creditors and to maintain the broadcast license of radio station WCBM–AM.

Thereafter, Metromedia sought to find another purchaser for the radio station and entered into negotiations with a newly formed corporation, WCBM Maryland, Inc. (WCBM). Nicholas B. Mangione (Mangione), is the chief executive officer of WCBM and owns, with his wife, all its stock. Those negotiations led to the execution of five agreements on October 19, 1988.[1] The five agreements were intended ultimately to result in the assignment of the broadcast license, sale of the radio station equipment, and the granting of a sub-sublease of the Premises to WCBM. The agreements provided for closing of the transaction to occur on or before February 28, 1989. Pending Federal Communications Commission (FCC) approval of the assignment of the broadcast license, the receiver gave WCBM the right to operate the radio station until the closing or termination of the relevant agreements.

---

1. The five agreements consist of:
    1. A "Lease Agreement" in which Metromedia leased the radio station equipment to the receiver of Magic 680 until February 28, 1989, or closing, whichever happened first.
    2. A "Sub–Sublease" in which Metromedia sub-subleased the Premises to the receiver of Magic 680 until February 28, 1989, or closing, whichever happened first.
    3. A "Consulting Agreement" in which the receiver of Magic 680 engaged WCBM to assist the receiver in operating the radio station. This agreement was terminable by either party upon 72 hours written notice.
    4. A "Purchase Agreement" in which the receiver of Magic 680 agreed to sell the broadcast license and radio station equipment to WCBM. FCC approval of the transfer of the broadcasting license to WCBM was a condition precedent to its obligation to close under this agreement. This agreement further provided that if closing were not concluded on or before February 28, 1989, it would become null and void.
    5. An "Agreement of Sub–Sublease" in which Metromedia agreed to sub-sublease the Premises to WCBM concurrently with the closing under the Purchase Agreement. This agreement provided that if closing were not consummated on or before February 28, 1989, it would become null and void.

On March 25, 1989, since FCC approval of the transfer of the broadcast license had not yet been obtained, Metromedia demanded that WCBM vacate the Premises, contending that the agreements were no longer valid due to the expiration of the February 28, 1989 deadline. On March 28, 1989, counsel for the receiver of Magic 680 wrote to WCBM advising that, since its right to possession of the Premises had terminated under its "Sub–Sublease" from Metromedia, it was notifying WCBM that it was terminating the "Consulting Agreement" 72 hours thereafter. WCBM refused to vacate on the grounds that all parties recognized prior to and at the time that the agreements were executed that the stated deadline date for the transfer of the license would be impossible to meet, and that so long as the transfer of the license was being diligently pursued and all expenses relating to the operation of the station and of the receiver were being paid by WCBM, the parties would continue under all the agreements until the transfer of the license was approved or denied by the FCC. It is undisputed that Mangione was on the Premises "quite often" and that he was the person at WCBM who made the decision to refuse to vacate the Premises. WCBM continued to tender the rent payments. WCBM also spent substantial sums improving and operating the station and maintaining the principal asset of the defunct Magic 680, the broadcast license.

On October 19, 1989, Metromedia filed an action in ejectment against WCBM and Mangione in the Circuit Court for Baltimore County. Metromedia sought repossession of the Premises from WCBM and damages from WCBM and Mangione. A jury trial commenced on October 2, 1990. At the close of Metromedia's case, the trial judge granted a motion for judgment made by Mangione stating that "I find that the plaintiff cannot claim that Mr. Mangione's wearing one hat when he's dealing with them, and then wearing another at a later time, and there's been no showing that he was dealing with Metromedia as an individual at any time." The trial resumed between Metromedia and WCBM; however, the jury failed to reach a verdict, and on October 11, 1990,

the court declared a mistrial. On October 15, 1990, the trial court issued an Order pursuant to Maryland Rule 2–602, directing the entry of final judgment in favor of Mangione. Metromedia appealed that judgment, and the Court of Special Appeals affirmed in an unreported opinion. We granted Metromedia's petition for writ of certiorari.

## II.

In a jury trial, Md.Rule 2–519(b) requires the trial judge in ruling on a defendant's motion for judgment made at the close of the plaintiff's evidence to "consider all evidence and inferences in the light most favorable to the party against whom the motion is made." Applying that rule in the instant case, Metromedia had established by competent evidence that WCBM occupied the Premises until February 28, 1989, by virtue of its "Consulting Agreement" with the receiver of Magic 680. The latter in turn occupied the premises under a sub-sublease from Metromedia, the term of which expired on February 28, 1989. Consequently, WCBM's right to occupy the Premises was no greater than that of Magic 680. Under that version of the transaction, WCBM in refusing to vacate the Premises in response to Metromedia's demand on March 25, 1989, became a trespasser thereon. That trespass constituted tortious conduct on the part of WCBM.

*Fett v. Sligo Hills*, 226 Md. 190, 172 A.2d 511 (1961) is apposite. In that case, the evidence showed that Herbert Fett was an accountant employed in New York by Sligo Hills Development Corp., that he moved to Washington, D.C. to work full time for the corporation, that Sligo built a house so that Fett and his family would have a place to live, and that the family moved into the premises with Sligo's permission. There was further proof that Sligo orally agreed to sell Fett the house for its cost, approximately $40,000, and that, when he sold his house in New York, he was to pay $25,000 in cash and give a deferred purchase money mortgage for the balance of the purchase price. Fett died several months after moving into the house. His

widow, without honoring her husband's promise to buy the house, continued to live in the house rent-free with her children and refused to vacate the premises upon Sligo's demand.

Sligo brought suit in ejectment and obtained a judgment for immediate possession of the house and damages against the widow and her children. We affirmed that judgment with a modification of the amount awarded as damages. Judge Hammond, later Chief Judge of this Court, wrote that "ejectment is an appropriate remedy under the circumstances of the case before us." *Id.* at 196, 172 A.2d at 514. Explaining the appropriate measure of damages, the Court stated:

> "On the question of damages as apart from the right to possession, we think a different test should be applied in this case. Sligo put the Fetts in possession without demanding or expecting compensation in return and left them there on that basis for an extended period. It should not be entitled to damages until their occupation became *tortious,* which we think was when the first unequivocal demand to all the Fetts, both adult and infants, to vacate the premises was made by the filing of the ejectment suit in May, 1958. *An occupancy rightful because permissive becomes tortious when a proper demand to vacate is ignored and it is then the occupants become trespassers and damages for their wrongful occupancy begin to accrue.* 1 Restatement, *Torts,* Sec. 158(b), and comment k thereof; Sec. 171, and comment d thereof."

*Id.* at 197, 172 A.2d at 514 (emphasis added).

### III.

█ It is undisputed that the decision to refuse to vacate the premises upon the demand of Metromedia was made by Mangione as the chief executive officer of WCBM. Since Mangione participated in what is alleged to be an unlawful detention of Metromedia's property by WCBM, he can be held personally liable for that tort of the corporation. In

*Tedrow v. Deskin,* 265 Md. 546, 550–51, 290 A.2d 799, 802–03 (1972), we explained:

"The general rule is that the corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body. *Fletcher v. Western Nat. Life Ins. Co.,* 10 Cal.App.3d 376, 89 Cal.Rptr. 78 (1970); *Miller v. Simon,* 100 Ill. App.2d 6, 241 N.E.2d 697 (1968); *Pacific & Atlantic Shippers, Inc. v. Schier* [109 N.H. 551], 258 A.2d 351 (N.H.1969); *McGlynn v. Schultz,* 95 N.J.Super. 412, 231 A.2d 386 (1967); *Faulk v. Milton,* 25 App.Div.2d 314, 268 N.Y.S.2d 844 (1966); 3 *Fletcher Cyclopedia Corporations* § 1135 (rev. vol. 1965). Of course, participation in the tort is essential to liability. If the officer takes no part in the commission of the tort committed by the corporation, he is not personally liable therefor unless he specifically directed the particular act to be done, or participated or cooperated therein. *Fletcher v. Havre de Grace Fireworks Co.,* 229 Md. 196 [177 A.2d 908] (1962); *Levi v. Schwartz,* 201 Md. 575, 583 [95 A.2d 322] (1953); *Buck v. Clauson's Inn at Coonamessett, Inc.,* 349 Mass. 612, 211 N.E.2d 349 (1965); *Martin v. Wood,* 400 F.2d 310 (3d Cir.1968); 3 *Fletcher Cyclopedia Corporations* § 1137 (rev. vol. 1965). It would seem, therefore, that an officer or director is not liable for torts of which he has no knowledge, or to which he has not consented. *Martin v. Wood, supra.* Thus, e.g., to make an officer of a corporation liable for the negligence of the corporation there must have been upon his part such a breach of duty as contributed to, or helped to bring about, the injury; he must have been a participant in the wrongful act. *United States Liability Ins. Co. v. Haidinger–Hayes, Inc.* [1 Cal.3d 586], 83 Cal.Rptr. 418, 463 P.2d 770 (1970); *Sensale v. Applikon Dyeing & Printing Corp.,* 12 N.J.Super. 171, 79 A.2d 316 (1951).

"The superior or managing officer of a corporation cannot be held liable for the misconduct of a subordinate

servant or employee unless the act is done with his consent or under his order or direction. *Kansas City v. Dickey,* 76 Mo.App. 437 [(App.Ct.1898)]. 3 *Fletcher Cyclopedia Corporations* § 1137 (rev. vol. 1965). But liability is not limited to tortious acts which he actually and physically commits; it extends as well to tortious acts which he actually brings about. *Fletcher supra."*

In *Tedrow,* an action for deceit, we reversed a summary judgment in favor of officers and employees of a corporation which sold a used car to the plaintiff who alleged that the officers and employees had knowledge that the odometer on the automobile he purchased from the corporation had been altered to reflect a lower mileage than the automobile had actually traveled.

We applied the same principle in *Fletcher v. Havre de Grace Co.,* 229 Md. 196, 200–01, 177 A.2d 908, 910 (1962) where we held that the officer and director of a fireworks company would be personally liable in action for trespass q.c.f. if they *"specifically directed, or actively participated or cooperated in,* a particular act of commission or omission that wrongfully triggered the series of explosions [which damaged plaintiff's property]."* (emphasis in original). And in *Levi v. Schwartz,* 201 Md. 575, 583–84, 95 A.2d 322, 327 (1953), we held that the president of a development corporation was personally liable for the corporation's tortious removal of lateral support from an adjacent landowner's lot of ground where the president daily visited the excavation underway on the corporation's land and supervised the operation. *See also Purdum v. Edwards,* 155 Md. 178, 186–87, 141 A. 550, 553–54 (1928) (president of real estate corporation held liable in an action of deceit by buyers of lot which was underwater but was represented by president of corporate seller as being "high and dry.")[2]

---

**2.** Maryland case law on corporate officer liability for torts committed by the corporation is consistent with the law as it exists in the great majority of jurisdictions. *See* 3A *Fletcher Cyclopedia Corporations* §§ 1135, 1137 (1986 & 1991 Cum.Sup.)

Without mentioning our holdings in the cases just reviewed, the Court of Special Appeals in deciding the instant case principally relied upon *K & K Management v. Lee,* 316 Md. 137, 557 A.2d 965 (1989), in concluding that as a matter of law Mangione was not liable under the evidence offered by Metromedia. That reliance is misplaced. In *K & K Management,* we held that corporate officers were not liable in a tort action for malicious interference with business where their only wrong was to cause their corporation to breach a contract with the plaintiff. That is not what was proven by Metromedia in the instant case; rather the evidence it offered was sufficient to establish that Mangione, as the chief executive officer of WCBM, decided that WCBM would not vacate the premises notwithstanding its lack of any right to occupy it. If Metromedia can convince a jury of that version of what has taken place between WCBM and itself, the jury will be justified in returning a verdict against Mangione personally for damages. Md. Rule T43.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENT IN FAVOR OF THE RESPONDENT, NICHOLAS B. MANGIONE, AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS IN CONFORMITY WITH THIS OPINION; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, MANGIONE.