765 A.2d 587

INSURANCE COMPANY OF NORTH AMERICA et al.

v.

William R. MILLER, II, et al.

No. 50, Sept. Term, 2000.

Court of Appeals of Maryland.

Jan. 11, 2001.

**362**

James R. Chason (Leora R. Simantov of Whiteford, Taylor & Preston, L.L.P., on brief), Towson, for appellants.

James R. Schraf of Lipshultz and Hone, Chartered, Silver Spring, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and LAWRENCE F. RODOWSKY, (Retired, specially assigned), JJ.

CATHELL, Judge.

This case involves an analysis of the fiduciary duty that an agent owes to its principal. Appellant, Insurance Company of North America et al. (INA),[1] filed a Complaint in the Circuit Court for Baltimore County against William Ray Miller, II, appellee, and North American Risk Management, Inc. (NARM),[2] alleging several causes of action, including conversion, breach of fiduciary duty, and negligence arising out of Miller's knowledge of, and participation in, a premium diversion scheme. Appellant filed a Motion for Partial Summary Judgment for the breach of fiduciary duty claim against Mr. Miller, which was denied by the Circuit Court.[3]

When the case went to trial on November 30, 1999, appellant proceeded against appellee on the claims for breach of fiduciary duty and negligence. After the evidentiary phase of the bench trial was concluded, the trial judge entered judgment in favor of NARM on all claims, and entered judgment in favor of appellee on the claims for conversion and "suit on account." Then the Circuit Court, prior to closing arguments,

1. Insurance Company of North America is one of numerous insurance companies that make up the CIGNA Property and Casualty Companies. The plaintiffs listed on the original complaint and collectively known as the CIGNA Companies were INA, Century Indemnity Company, CIGNA Fire Underwriters Insurance Company, CIGNA Insurance Company, CIGNA Property and Casualty Insurance Company, Indemnity Insurance Company of North America, Pacific Employers Insurance Company, and Bankers Standard Insurance Company.

2. NARM is an insurance agency and brokerage firm duly organized and existing under the laws of the State of Maryland with its principle place of business in Annapolis, Maryland. Appellee set up NARM in early 1997, when, as we discuss, *infra*, the previous agency with whom appellee was associated, Hickman Agency, ceased operations. Appellee is currently the President and Chief Executive Officer of NARM.

3. This was an ex contractu action based upon breaches of the agency agreement. It was alleged that the breaches of fiduciary duty constituted breaches of the agency contract.

requested that the parties prepare trial memoranda on the relevant law concerning the fiduciary duty that an agent owes to a principal. Closing arguments took place on December 10, 1999, after which the Circuit Court entered judgment in favor of appellee on all remaining counts. Appellant filed a timely notice of appeal to the Court of Special Appeals. On our own initiative, we granted review prior to argument in the Court of Special Appeals. Appellant presents two questions to this Court:

1. Did the trial court err by ruling that Miller did not breach any fiduciary duties and was not negligent by obtaining premium financing for an insurance premium of an INA insured, and using the funds to pay another premium financing company, instead of paying the funds directly to INA for the premium due?

2. Did the trial court err by ruling that Miller was not an agent of INA for the purpose of collecting premiums and forwarding premiums to INA, and, as a result, did not breach any fiduciary duties by failing to do so?

We answer both questions in the affirmative. Under the circumstances here present, appellee was an agent of INA for the purpose of collecting and forwarding premiums, which imposed upon him a fiduciary duty to INA, which he breached by failing to forward to INA the relevant premiums and/or by not notifying INA, or timely sharing with INA his knowledge, that the premiums at issue were being improperly diverted. Additionally, appellee breached his fiduciary duty to INA when he actively participated in obtaining premium financing for an insurance premium of an INA insured, and used the funds to return to another premium financing company monies due it on a completely unrelated transaction, instead of causing the funds to be remitted directly to INA for the premium due it. We also hold that appellee's actions in the double financing scheme, at a minimum, could constitute negligence. Accordingly, we reverse the ruling of the Circuit Court for Baltimore County and shall remand the case to that court for further proceedings consistent with this opinion.

## I. Facts

Appellee has been a licensed insurance agent in the State of Maryland since 1992. Appellee worked at J.L. Hickman & Company, Inc.,[4] a Texas-based insurance brokerage, from approximately 1993 to early 1997, when the Hickman Agency went out of business. The Hickman Agency's primary line of business was writing coverage for the funeral industry. At some point prior to August 1995, appellee became the Chief Operating Officer and Executive Vice President of the Hickman Agency, and held himself out as such. He was paid a salary as an employee of the Hickman Agency and earned commissions on insurance sales generated by himself and the Hickman Agency.

Effective August 1, 1995, the Hickman Agency entered into a CIGNA Agency Company Agreement with INA. This agreement was signed by appellee as Chief Operating Officer and Executive Vice President of the Hickman Agency. The agreement created a principal-agent relationship between INA and the Hickman Agency, respectively, from August 1, 1995 until the Hickman Agency ceased operations in early 1997. The agreement provided:

1 Our Relationship
 a *Authority.* You will act as our agent for those lines of business and those territories in which you and we [5] are both licensed and where we specifically authorize you to do business. . . .

 . . . .

2 Your Authority and Duties

 . . . .

------

4. John L. Hickman, an insurance agent with a Maryland license, was the owner, President, and Chief Executive Officer of J.L. Hickman & Company, Inc. J.L. Hickman & Company, Inc. was known by several other names, including IFA Insurance Services and American Funeral Insurance Group (AFIG). For ease of reference, we will refer to the entity as the "Hickman Agency" throughout this opinion.

5. The Agreement provides that "you" refers to the Hickman Agency and "we" refers to the relevant CIGNA Companies.

b *Collection of Premiums.*

. . . .

3 All premiums, including return premiums, which you receive are our property. You will hold such premiums as a trustee for us. This trust relationship and our ownership of the premiums will not be affected by our books showing a creditor-debtor relationship, the amount of balances at stated periods or your retention of commissions. Unless we agree otherwise in writing, you must maintain premium monies in a separate bank account and not mingle such monies with your own funds.

On at least two separate occasions, Mr. Miller acknowledged that his personal relationship with INA was that of agent and principal. At trial, Mr. Miller, through counsel, stipulated that he was an appointed agent for INA from October 1995 through the Spring of 1997. Additionally, in a third-party action filed by appellee in the Circuit Court for Baltimore County against Utica Mutual Insurance Company, case number 03–C–97–007281, he again recognized the principal-agent relationship between INA and himself and that the provisions of the agreement applied to him individually.

INA has brought this complaint against appellee for his actions and involvement in a complex double financing scheme. According to Ms. Mannino's [6] testimony, the Hickman Agency had three bank accounts: Account Number 346 was a money market account; Account Number 80900 was referred to as a commission account; and Account Number 722 was a trust account to which premium trust monies were to be deposited so as to be available to pay premiums to insurance carriers. These accounts were not managed properly—as discussed, *infra,* the premium dollars, intentionally, were not held "in trust" at the agency.

---

**6.** Ms. Donna Mannino, an employee of the Hickman Agency, was hired by Mr. Miller in 1994 as a customer service and account representative and eventually became the office manager and Assistant Vice–President.

The Hickman Agency and appellee [7] were required under Maryland insurance regulations and its agreement with the CIGNA Companies to hold premium dollars paid by an insured or a premium financing company in trust for INA.[8] On redirect examination, Mr. Miller acknowledged that it was a general practice that an insurance company would expect proceeds of a premium financing agreement to be paid directly to it, without being retained by the insurance agency. The Hickman Agency's cash flow management plan involved agents, including appellee, obtaining an insurance policy for a customer and setting up an installment payment plan for the premium due with the insurance company. The agent would not always inform the insured of the installment plan. At the same time, the agent, in this case appellee, would obtain financing of the same premium amount for the insured through a premium financing company.

Generally, the premium financing company would pay the full amount of the premium to the Hickman Agency, with the expectation that the full amount would be paid directly to the insurance company. However, under the scheme utilized by the Hickman Agency and known to appellee, the full amount received from the premium financing company was not immediately paid over to insurance companies, including INA. Instead, the Hickman Agency would deposit the premium payment into its own bank account, and only pay the insurance company the amount of the "installment" that the insurance company believed, as a result of information furnished by the agency, was due. The insured's premiums would generally be used to repay the premium financing company over a period of time. Apparently, neither the insureds, nor the premium financing companies, nor the insurer were aware of the

---

7. In the case at bar, Miller, unlike insurance agents that have limited knowledge of the practices of a brokerage, had knowledge of, and actively participated in, the breaches of fiduciary duties that occurred.

8. See COMAR 31.03.03.01, discussed *infra*.

scheme.[9]

The money that improperly remained with the Hickman Agency was moved with appellee's knowledge and sometimes with his active participation out of the trust account and was apparently used to pay other expenses within the Hickman Agency. This was true for premiums paid to the Hickman Agency on INA accounts as well as accounts of other insurance companies. In other words, the premiums were held "out-of-trust." By depositing the full amount of the insured's premium advanced by the premium financing company (or the insured) into its own bank account, the Hickman Agency had the benefit of having the money (or part of it) for its own use from the time the money was received until the money was needed to pay installments to the insurance company.[10]

Appellee was aware of, and actively participated in, and was in charge of, several accounts that had this "double financing" scheme in place. The evidence presented on the record demonstrates that he was responsible for signing checks and sending premium payments to INA for "installments" that INA believed were due on numerous accounts. Mr. Miller admitted, during direct examination, that "it wouldn't be necessary for the insured to stretch out payments over time with an installment plan if they had an insurance premium financing plan in place...." Ms. Suzanne DiSanti, a financial coordinator for the CIGNA Companies, testified that no "rule

9. The insured might pay the entire premium to Hickman or Hickman might cause the entire premium to be financed. In either event, Hickman would only remit to the insurance company installments of the premium, diverting the main portion of the premium to its own use. Apparently, eventually, it began utilizing financed premium sums of one policy to pay installments to premium financing companies in respect to previous premium financed policies. In other words, it appears to have been a modified insurance "Ponzi scheme."

10. For example, if a premium financing company financed $1000.00 of a policy for an insured, and paid $1000.00 to the Hickman Agency for the premium, $1000.00 would be deposited into a Hickman Agency's bank account. At the same time, the insurance company, which was led to believe that the insured was paying a premium on an installment plan, requested payment from the Agency only for the first installment of $100.00. The Hickman Agency would pay the requested $100.00, leaving $900.00 remaining in the Agency's bank account for its own use. After the second installment was remitted, Hickman would have the use of $800.00, etc.

or regulation or policy of the CIGNA Companies allow the use of premium funds for anything other than paying CIGNA's premiums as they are due[.]" She further testified that had CIGNA known of the double financing scheme, it would not have permitted it "[b]ecause a policy would never be put on installments if it was known to be premium financed." She continued, "if we find out that a policy is premium financed and have not been told by the agent or broker, we immediately notify the underwriting department so that they can contact the agent or broker and tell them that all monies have to be paid up front and that the policy is then put back on annual pay."

One example of appellee's participation in the double financing scheme is his actions in January and February of 1997, with respect to an INA insured, Gunther's Leasing Transport, Inc. (Gunther's Leasing).[11] The Gunther's Leasing account included general liability, auto and workers' compensation coverage and "produced something in excess of a million dollars in premium." Gunther's Leasing account had premium financing in place with INAC, a premium financing company. Sometime in 1996, INAC contacted the Hickman Agency and requested $400,000.00 in premium funds to be returned because of a problem with the Gunther's Leasing account. Because the Hickman Agency was not segregating premium financing funds, and was using premiums paid into the agency for purposes other than paying premiums, the $400,000.00 that had been paid to the Hickman Agency by INAC, in respect to the Gunther's Leasing premiums, was not in the Hickman Agency Trust Account. Appellee testified that he became aware of the fact that the funds were out-of-trust in late December 1996 or January 1997. Appellee also testified that

---

11. Appellee contends that although the Gunther's Leasing account was originally his, that Mr. Hickman assumed responsibility for that account in early to mid December of 1996. He also alleges that in early January 1997, his signature stamp which he used for signing and counter-signing documents on behalf of the Agency disappeared. He also alleges that he never attempted to conceal the double financing plan from insureds.

the double financing scheme was inappropriate. However, instead of explaining to INAC that the funds were out-of-trust, appellee, himself, obtained premium financing on a completely unrelated Gunther account expressly for the improper purpose of paying back INAC funds relating to the Gunther's Leasing account.

To effectuate the scheme, appellee arranged for premium financing of a separate INA policy for workers' compensation for Gunther's Leasing, which had a premium of approximately $671,000.00. According to Ms. Mannino's testimony, premium financing was obtained, at appellee's direction, from another premium financing company, AI Credit, for approximately $494,000.00 of this premium, not for the stated purpose of remitting the sum to INA on the workers' compensation policy, but for the purpose of returning to INAC $400,000.00 advanced by INAC on a completely unrelated policy. Ms. Mannino also testified that, pursuant to appellee's authorization, she signed this premium financing agreement using appellee's signature stamp. No employee of the Hickman Agency told Gunther's Leasing, INA, or INAC about the double premium financing arrangement. Specifically, the arrangement was concealed from Gunther's Leasing, INA, INAC, and AI Credit. Gunther's Leasing was instructed to pay the premium to the Hickman Agency in installments of approximately $58,000.00.

Realizing the potential problems of such activities, Ms. Mannino prepared a Memorandum to John Hickman, dated February 17, 1997, in which she outlined the scheme:

WE ALSO NEED TO REMEMBER THAT RAY [APPELLEE] HAS FINANCED THIS PREMIUM TO PAY THE BALANCE DUE BACK TO INAC. THE MONTHLY INSTALLMENTS ARE DUE IN THE AMOUNT OF $56,612.18 BY 2/15/97. IF WE DO NOT PAY THIS CINDY [12] WILL BE GETTING A NOTICE FROM AI CREDIT FOR THE PAYMENT DUE AND WE DO NOT

---

12. "Cindy" refers to Ms. Cindy Gunther, who handled the accounting for Gunther's Leasing.

WANT THAT TO HAPPEN. I KNOW WE HAD A BAL-
ANCE OF 94,000.00 REMAINING FROM THIS
AMOUNT FINANCED AFTER WE RETURNED THE
400,000.00 TO INAC. I SAY WE SENT AI CREDIT THE
$94,000.00 BACK AND GET THE INSTALLMENTS AD-
JUSTED AND THEN WE WILL NEED TO REMEM-
BER THAT WE NEED TO MAKE THESE MONTHLY
PAYMENTS ON THE 15TH OF EACH MONTH UNTIL
OCTOBER. WE ALSO NEED TO REMEMBER TO
MAKE THE PAYMENTS ON TIME SO THAT WE
AVOID A CANCELLATION NOTICE BEING SENT TO
EITHER GUNTHER'S OR CIGNA [ (INA) ].

Once the agreement was signed, AI Credit, paid $494,000.00 to the Hickman Agency, which deposited the money into its trust account in January 1997. Immediately thereafter, the money was transferred to another account, from which a check for $400,000.00 was written to INAC. The proceeds of the financing arrangement for the Gunther's Leasing worker's compensation policy were not held in trust and were not used to pay the premium of the workers' compensation policy to the insurer, INA. Instead they were used to pay INAC, the premium financing company on the separate policy. The premium was diverted from INA and, as a result, INA was not paid the proceeds of the financed workers' compensation policy.

INA was not paid the premium for numerous insureds with policies bound through the Hickman Agency. After the Hickman Agency collapsed in 1997, Ms. Mannino sent letters to INA on behalf of several insureds to explain that the insureds had paid the premium for their policies, and that INA should not cancel their policies even though it had not received the premium payments.[13] At trial, appellant introduced two examples of installment payments by the Hickman Agency to

---

**13.** Additional INA insureds included: Wilson Financial Group, Shrine of Remembrance, Everett Derr and Anderson Funeral Home, Berge Pappas Smith Mortuary, Miles–Dameron Funeral Home, Fairhaven Realty Associates, Trousdale Enterprises, and South Valley Funeral Escorts.

INA for installments INA believed were due, based on the improper representations to INA that the policy premiums would be paid in installments. Appellee signed the checks payable to INA for these improper installment payments. The Hickman Agency collapsed shortly thereafter and its employees tendered their resignations in March 1997.

Appellee admitted that by at least as early as the latter part of 1996, he was aware that the Agency was "out-of-trust" and of the double financing scheme. He did not advise the Maryland Insurance Administration or INA that the Hickman Agency was out-of-trust and he participated in the scheme until at least the end of March 1997. Prior to Ms. DiSanti's testimony, the parties agreed that the amount of money owed to INA by the Hickman Agency was $597,850.00. Ms. DiSanti's report which contained this information was entered into evidence as plaintiff's exhibit 23. The trial court did not consider the issue of damages in its opinion.

## II. Discussion

■ In an action tried without a jury, an appellate court "will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). However, "[t]he clearly erroneous standard for appellate review in [Maryland Rule 8–131] section (c) . . . does not apply to a trial court's determinations of legal questions or conclusions of law based on findings of fact." Heat & Power Corp. v. Air Products & Chem. Inc., 320 Md. 584, 591, 578 A.2d 1202, 1205 (1990). The determination of the existence of a principal-agent relationship is, generally, a question of fact. The evidence presented in this case, however, demonstrates that Mr. Miller (1) stipulated to the fact that he was an appointed agent of INA, and (2) asserted in court memoranda in a related court proceeding that he was an "appointed agent."

Although the trial court acknowledged this stipulation, it improperly limited the scope of his agency under the relevant Maryland law surrounding such principal-agent relationships.

## A. Principal–Agent Relationship

 "Agency is the fiduciary relation which results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his control and consent by the other so to act." *Green v. H & R Block, Inc.*, 355 Md. 488, 503, 735 A.2d 1039, 1047 (1999) quoting RESTATEMENT (SECOND) OF AGENCY § 1 (1958); *see Brady v. Ralph Parsons Co.*, 308 Md. 486, 509, 520 A.2d 717, 729–30 (1987); *Patten v. Board of Liquor License Comm'rs*, 107 Md.App. 224, 238, 667 A.2d 940, 947 (1995). Although such a relationship is not necessarily contractual in nature, it is always consensual, *Lohmuller Bldg. Co. v. Gamble*, 160 Md. 534, 539, 154 A. 41, 43 (1931), and its creation is to be determined by the relations of the parties as they exist under their agreements or acts. *American Casualty Co. v. Ricas*, 179 Md. 627, 631, 22 A.2d 484, 487 (1941). The ultimate question is of intent. *See Howard Cleaners v. Perman*, 227 Md. 291, 295, 176 A.2d 235, 237 (1961); *American Casualty Co.*, 179 Md. at 631, 22 A.2d at 487.

The record of the case *sub judice* provides:

Q. Can you tell us whether Mr. Miller was an appointed agent by the CIGNA Companies?

MR. CONTE: [14] Objection.

THE COURT: Is that issue in dispute?

. . . .

MR. CONTE: That is not in dispute. Objection withdrawn.

. . . .

THE COURT: The fact that he was an agent during the time period. . . .

---

14. At trial, Mr. Conte was counsel for appellee and Mr. Chason was counsel for appellant.

MR. CHASON: As of October of 1995. If counsel will stipulate to that, we can move on.

THE COURT: And continuing?

MR. CHASON: And continuing into 1997.

. . . .

THE COURT: You're not disputing that Miller was an agent for the CIGNA group from 1995 through 1997, is that correct?

MR. CONTE: Through—until May of '97.

THE COURT: From what?

MR. CONTE: May of '97.

MR. CHASON: That's fine. May of 1997.

THE COURT: That's good.

MR. CHASON: We'll take as established.[15]

■ Through counsel, both during the trial of the case at bar, and in the related third-party action, appellee made a judicial admission that he was an agent arising from the Agreement between the Hickman Agency and CIGNA. Under Maryland law, there is a *prima facie* presumption that an attorney has the authority to bind his client by his actions related to litigation. As we have said:

> [T]here is a *prima facie* presumption that an attorney has authority to bind his client by his actions relating to the conduct of litigation. *Posko v. Climatic Control Corp.*, 198 Md. 578, 584[, 84 A.2d 906]; *Wanzer v. State*, 202 Md. 601, 608[, 97 A.2d 914]; *Thomas v. Hopkins*, 209 Md. 321, 327[, 121 A.2d 192]; *Smith v. Warden*, 213 Md. 643[, 131 A.2d

**15.** *See Utica Mutual Insurance Company v. Miller*, 130 Md.App. 373, 389, 746 A.2d 935, 944, *cert. denied*, 359 Md. 31, 753 A.2d 3 (2000), where the Court of Special Appeals stated, "[Miller] was a general agent for [INA]." Additionally, in *Reliance Insurance Company v. J.L. Hickman & Company*, civil action number MJG–97–3194, a case pending in the United States District Court for the District of Maryland, before Judge Marvin J. Garbis, an implied agency relationship was found to have existed between Mr. Miller and another insurance company with which Mr. Miller did not even have an agency appointment at the time of the transactions alleged in that case, which also arose out of policies issued to Gunther's Leasing.

392]. Cf. 2 *Restatement (Second), Agency,* § 284, comment e (1958). This is particularly true of stipulations or admissions made in the course of a trial. The appellee contends, however, that while a client may be bound by an admission by counsel in a pending case, he is not bound in subsequent litigation, and especially where a different issue is presented. We see no reason for the distinction. It is generally recognized that admissions made by an attorney may be available, for proper evidential purposes, in other litigation. See 4 Wigmore, *Evidence,* § 1063 (3d ed., 1940), *McCormick, Evidence,* § 244, p. 520 (1954), and *McGarity v. New York Life Ins. Co.,* 359 Pa. 308, 59 A.2d 47, 50.

*Secor v. Brown,* 221 Md. 119, 123–24, 156 A.2d 225, 227 (1959).

Mr. Miller's acknowledgment, through counsel, both during the trial proceedings in the case *sub judice,* and in a third-party action filed by him against Utica Mutual Insurance Company, as to the significance of the Agreement to him individually, is germane to the issue at bar. As we have said, " '[a] man shall not be allowed to blow hot and cold, to claim at one time and deny at another.' " *Van Royen v. Lacey,* 266 Md. 649, 652, 296 A.2d 426, 428 (1972) quoting *Cave v. Mills,* 7 H. & W. 927. Mr. Miller was an appointed agent of the CIGNA Companies, including INA.

## B. Fiduciary Relationship

■ The issue before us, therefore, is not whether Mr. Miller was an agent of INA but what was the scope of his agency relationship. The trial court inappropriately limited the scope of Mr. Miller's agency relationship to that of an "insurance agent" who sold insurance and ruled that his role as an insurance agent did not obligate him to ensure that premiums were forwarded to INA. Under this theory, Mr. Miller only had a duty to sell insurance and contractually bind INA, but then did not have the corresponding duty to see to the remittance of premiums to INA for insurance coverage bound.[16]

---

**16.** As we have indicated, Mr. Miller did not lack knowledge of the events that were occurring, and was an active participant in the events

The scope of Mr. Miller's agency is not limited by a description of "insurance agent." As we discussed, *supra,* he stipulated to the fact that he was an appointed agent of INA. This relationship is not somehow limited because he is an insurance agent, rather, it is a broader relationship than that which the trial court found.

Maryland Code (1995, 1997 Repl.Vol.), section 1–101(c) of the Insurance Article provides in relevant part:

(c) *Agent.*—(1) "Agent" means a person that, for compensation, solicits, procures, negotiates, or makes insurance contracts, including contracts for nonprofit health service plans, dental plan organizations, and health maintenance organizations, or the renewal or continuance of these insurance contracts for persons issuing the insurance contracts.

(2) "Agent" does not include:

(i) an individual who performs clerical, stenographic, or similar office duties while employed by an agent or insurer, including a clerical employee, other than a clerical employee of an insurer, who takes insurance information or receives premiums in the agent's office, if the employee's compensation does not vary with the number of applications or amount of premiums;

(ii) a regular salaried officer or employee of an insurer who gives help to or for a qualified agent, if the officer or employee is not paid a commission or other compensation that depends directly on the amount of business obtained; or

(iii) if not paid a commission, a person that obtains and forwards information for:

1. group insurance coverage;

2. enrolling individuals under group insurance coverage; or

---

constituting breaches of fiduciary duty. He was a stipulated agent of INA itself, not a mere employee of Hickman. The trial court, in any event, erroneously limited the scope of "insurance agents," who have knowledge of improprieties, as we note, *infra.*

3. issuing certificates under group insurance coverage.

. . . .

(g) *Appointment.*—"Appointment" means an agreement between an agent and insurer under which the agent, for compensation, may solicit, procure, negotiate, or make policies issued by the insurer.[17]

Appellee meets all of the criteria to be an appointed agent outlined above. Additionally, he does not meet any of the criteria set up in subsection 1–101(c)(2) that would exempt him from status as an agent of INA. Specifically, section 1–101 clarifies that, under Maryland's Insurance Code, an appointed agent generally has all the responsibilities and duties typically bestowed upon any agent. That imposes upon him the duty to inform his principal of any improprieties of which he has knowledge and forbids his active participation in any such improper actions. The trial court erred in attempting to limit this relationship.

The trial court's reasoning also fails to acknowledge Mr. Miller's obligations under standard Maryland insurance regulations. It is clear under the Code of Maryland Regulations (COMAR), that keeping funds "in trust" is one of the duties of insurance agents. The Code of Maryland Regulations (COMAR) 31.03.03.01 provides:

A. Every insurance agent and broker acting as such in this State who does not have the express written consent of his or its principals to mingle premium monies with his or its personal funds shall hold the premium monies separate from other funds in accordance with this regulation.

B. Agents and brokers who do not make prompt remittance to principals and assureds of the funds shall deposit

---

**17.** See also Maryland Code (1995, 1997 Repl.Vol.), section 10–103(a) of the Insurance Article which provides:

(a) *Agents—In general.*—Except as otherwise provided in this article, before a person acts as an agent in the State, the person must obtain:

(1) a certificate of qualification in the kind or subdivision of insurance for which the person intends to act as an agent; and

(2) an appointment from an insurer.

them in one or more appropriately identified accounts in a bank or banks authorized to do business in this State or subject to jurisdiction of this State, from which withdrawals may not be made except as hereinafter specified (any such account is hereinafter referred to as a "premium account").

. . . .

E. Withdrawals.

(1) Withdrawals from a premium account may not be made other than for the following purposes:

(a) Payment of premiums to principals.

(b) Transfer to an operating account of bank interest, if the principals have consented to it in writing.

(c) Transfer to an operating account of commissions either actual or average. If average commissions are used, the agent or broker shall maintain on file in his office at all times a letter from each principal stating the percentage of the average commission.

(d) Withdrawal of voluntary deposits.

(e) Payment of return deposits to assureds.

(f) Payment of return premiums to assureds in the ordinary course of business when a written agreement with the principal authorizing this practice exists.

(2) However, a withdrawal may not be made if the balance remaining in the premium account thereafter is less than aggregate net premiums, return premiums, and deposits received but not remitted.

These provisions, and the terms of the 1995 agreement between CIGNA and Hickman, demonstrate that Mr. Miller's duties, as an appointed agent of INA, with knowledge of what was occurring, include the duty to make or insure the remittance of payments to INA and to keep premium funds in trust. His responsibilities were not merely limited to the selling of insurance.

The trial court relied on our analysis in *Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509, 521 (1997), where we said:

[W]e hold that there is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries. This does not mean that there is no claim or cause of action available for breach of fiduciary duty. Our holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion. Counsel are required to identify the particular fiduciary relationship involved, identify how it was breached, consider the remedies available, and select those remedies appropriate to the client's problem.

Contrary to the trial court's ruling, we hold that appellant: (1) identified the particular principal-agent fiduciary relationship created in the case at bar; (2) identified that it was breached by appellee participating in the double financing scheme, not forwarding premiums, and not informing INA that premiums were out-of-trust; (3) considered the remedies available; and (4) selected those remedies appropriate to the client's problem.

We have recently had the opportunity to expound on the duties that an agent owes, generally, to any principal in *Green v. H & R Block, Inc.*, 355 Md. 488, 517–19, 735 A.2d 1039, 1055–56 (1999):

The duties an agent owes to his or her principal are well established. An agent has "a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." RESTATEMENT (SECOND) OF AGENCY § 387 (1958). We have recognized the

" 'universal principle in the law of agency, that the powers of the agent are to be exercised for the benefit of the principal *only, and not of the agent or of third parties.* A power to do all acts that the principal could do, or all acts of a certain description, for and in the name of the principal, is limited to the doing of them for the use and benefit of the principal only, *as much as if it were so expressed.*' " (Emphasis in original).

*King v. Bankerd*, 303 Md. 98, 108–09, 492 A.2d 608, 613 (1985)(quoting *Adams' Express Co. v. Trego*, 35 Md. 47, 67

(1872)). Moreover, an agent is under a strict duty to avoid any conflict between his or her self-interest and that of the principal: " 'It is an elementary principle that the fundamental duties of an agent are loyalty to the interest of his principal and the need to avoid any conflict between that interest and his own self-interest.' " *C–E–I–R, Inc. v. Computer Dynamics Corp.*, 229 Md. 357, 366, 183 A.2d 374, 379 (1962) (quoting *Maryland Credit v. Hagerty*, 216 Md. 83, 90, 139 A.2d 230, 233 (1958)). As Professor Mechem has observed:

> "It is the duty of the agent to conduct himself with the utmost loyalty and fidelity to the interests of his principal, and not to place himself or voluntarily permit himself to be placed in a position where his own interests or those of any other person whom he has undertaken to represent may conflict with the interests of his principal."

PHILIP MECHEM, MECHEM OUTLINES AGENCY § 500, at 345 (4th ed.1952). . . .

One of the primary obligations of an agent to his or her principal is to disclose any information the principal may reasonably want to know. *See Impala Platinum v. Impala Sales*, 283 Md. 296, 324, 389 A.2d 887, 903 (1978)(quoting *Herring v. Offutt*, 266 Md. 593, 597, 295 A.2d 876, 879 (1972)) (recognizing duty of fiduciary "to make full disclosure of all known information that is significant and material to the affairs" of the fiduciary relationship); *C–E–I–R, Inc.*, 229 Md. at 367, 183 A.2d at 379–80 ("[T]he rule is well established that an agent is under a duty to disclose to his [principal] any information concerning the agency which the [principal] would be likely to want to know."). The obligation to disclose is strongest when a principal has a conflicting interest in a transaction connected with the agency. *See* RESTATEMENT (SECOND) OF AGENCY § 389 (1958) ("Unless otherwise agreed, an agent is subject to a duty not to deal with his principal as an adverse party in a transaction connected with his agency *without the principal's knowledge.*") (emphasis added). An agent's failure to dis-

close information material to the agency thus constitutes a breach of the principal-agent relationship.

Where an agent breaches a duty to the principal and profits from the breach, the principal may maintain an action to recover those profits for her or himself. *Nagel v. Todd*, 185 Md. 512, 517, 45 A.2d 326, 328 (1946) (An agent "cannot make a secret profit out of any transaction with his principal."); RESTATEMENT (SECOND) OF AGENCY § 388 (1958) ("[A]n agent who makes a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal.").... [Alterations in original.]

In the case *sub judice*, appellee stipulated that he was an agent of INA from 1995 until May 1997. The evidence is clear that he had knowledge of what was occurring and participated in part of the scheme. As an agent, he had a fiduciary duty to INA, which he breached. *See id.* at 504, 735 A.2d at 1048 (" 'An agent is a fiduciary with respect to matters within the scope of his agency.' ") quoting RESTATEMENT (SECOND) OF AGENCY § 13 (1958). RESTATEMENT (SECOND) OF AGENCY § 13 further provides:

> Among the agent's fiduciary duties to the principal is the duty to account for profits arising out of the employment, the duty not to act as, or on account of, an adverse party without the principal's consent, the duty to not compete with the principal on his own account or for another in matters relating to the subject matter of the agency, and the duty to deal fairly with the principal in all transactions between them.

The federal courts and courts of our sister states are generally in accord. *See generally Frey v. Fraser Yachts*, 29 F.3d 1153, 1159 (7th Cir.1994) (" 'The chief object of the principle [of agency] is not to compel restitution where actual fraud has been committed, or unjust advantage gained, but it is to prevent the agent from putting himself in a position in which to be honest must be a strain on him, and to elevate him to a position where he cannot be tempted to betray his principal.' "

(quoting *Quest v. Barge,* 41 So.2d 158, 164 (1949))); *Chemical Bank v. Security Pac. Nat'l Bank,* 20 F.3d 375, 377 (9th Cir.1994) ("The very meaning of being an agent is assuming fiduciary duties to one's principal."); *Burdett v. Miller,* 957 F.2d 1375, 1381 (7th Cir.1992) ("A fiduciary duty is the duty of an agent to treat his principal with the utmost candor, rectitude, care, loyalty, and good faith—in fact to treat the principal as well as the agent would treat himself."); *Pohl v. National Benefits Consultants, Inc.,* 956 F.2d 126, 128–29 (7th Cir.1992) ("A fiduciary is an agent who is required to treat his principal with utmost loyalty and care—treat him, indeed, as if the principal were himself."); *Canney v. City of Chelsea,* 925 F.Supp. 58, 64 (D.Mass.1996) (stating that one of the three essential characteristics of an agency relationship as "the existence of a fiduciary relationship toward the principal with respect to matters within the scope of the agency"); *Village on Canon v. Bankers Trust Co.,* 920 F.Supp. 520, 532 (S.D.N.Y.1996) ("It is true that an exclusive agency gives rise to a fiduciary duty between principal and agent. . . ."); *Select Creations Inc. v. Paliafito America, Inc.,* 911 F.Supp. 1130, 1153 (E.D.Wis.1995) ("The fiduciary duty owed by an agent to a principal includes the duty of undivided loyalty."); *Thomas v. Hodge,* 897 F.Supp. 980, 982 (W.D.Ky.1995) ("An agency is a fiduciary relationship. . . ."); *In re HH (US), Inc.,* 175 B.R. 188, 194 (Bkrtcy.W.D.Pa.1994) ("Because the [agency] relationship is fiduciary in nature, the agent has a duty of loyalty to act for the benefit of the principal."); *Western Medical Consultants, Inc. v. Johnson,* 835 F.Supp. 554, 558 (D.Or.1993) ("An agent owes her principal a fiduciary duty of loyalty . . . ."), *aff'd by,* 80 F.3d 1331 (9th Cir.1996); *KMart Corp. v. First Hartford Realty Corp.,* 810 F.Supp. 1316, 1329 (D.Conn. 1993) ("Agency is a 'fiduciary relationship. . . .' "); *Apollo Technologies Corp. v. Centrosphere Industrial Corp.,* 805 F.Supp. 1157, 1195 (D.N.J.1992) ("An agency is a fiduciary relationship. . . ."); *McLendon v. Georgia Kaolin Co.,* 782 F.Supp. 1548, 1563 (M.D.Ga.1992) ("The relationship between principal and agent is confidential and fiduciary and under this relationship, an agent owes his principal a full duty of disclo-

sure.") (internal citations omitted); *Gardner v. Cumis Ins. Soc'y, Inc.*, 582 So.2d 1094, 1096 (Ala.1991) ("The principal-agent relationship is fiduciary by nature and imposes a duty of loyalty, good faith, and fair dealing on the part of the agent."); *Dent v. Wright,* 322 Ark. 256, 261, 909 S.W.2d 302, 304 (1995) ("[I]t has long been recognized that a fiduciary relationship exists between principal and agent in respect to matters within the scope of the agency."); *Michelson v. Hamada,* 29 Cal.App.4th 1566, 1579, 36 Cal.Rptr.2d 343, 348 (1994) ("An agent *is* a fiduciary."); *Capital Bank v. MVB, Inc.,* 644 So.2d 515, 518 (Fla.App. 3 Dist.1994) (identifying the agent-principal relationship as one of several recognized fiduciary duties), *review denied,* 654 So.2d 918 (1995); *State Sec. Ins. Co. v. Frank B. Hall & Co.,* 258 Ill.App.3d 588, 595, 196 Ill.Dec. 775, 780–81, 630 N.E.2d 940, 945–46 (1 Dist.1994) ("An agency is 'a consensual, fiduciary relationship....'"); *River's Bend Red–E–Mix, Inc. v. Parade Park Homes, Inc.,* 919 S.W.2d 1, 4 (Mo.App. W.D.1996) (stating that one of the three elements of agency is "a fiduciary relationship with respect to matters within the scope of the agency"); *Maurillo v. Park Slope U–Haul,* 194 A.D.2d 142, 146, 606 N.Y.S.2d 243, 246 (1993) ("[Agency] is a fiduciary relationship...."); *Thompson v. Central Ohio Cellular, Inc.,* 93 Ohio App.3d 530, 540, 639 N.E.2d 462, 468 ("A person who occupies a fiduciary relationship to another acts as an agent to that person and owes the utmost loyalty and honesty to the principal."), *appeal denied,* 70 Ohio St.3d 1415, 637 N.E.2d 12 (1994); *Maryland Ins. Co. v. Head Indust. Coatings & Services, Inc.,* 906 S.W.2d 218, 233 (Tex.App.—Texarkana 1995) ("Inherent in any agency relationship is the fiduciary duty owed by an agent to his principal."), *reversed on other grounds,* 938 S.W.2d 27 (Tex.1996).

As an agent and a fiduciary, Mr. Miller had the duty to act with the utmost loyalty and fidelity towards his principal, INA, and was required by this fiduciary relationship to give the fullest measure of service in all matters pertaining to the agency. Instead of acting with loyalty and fidelity towards INA, Mr. Miller breached his fiduciary duty in numerous ways. First, he knew that premiums were not being remitted

to INA, but failed to inform INA, and did not cause the remittance of premium payments to the insurer. Second, he participated in a double financing scheme where the Hickman Agency withheld premiums from INA based on the representation to INA that the premiums were to be paid in installments, when the Agency was already in possession of the entire premium amount either from insureds or from premium financing companies on behalf of insureds. He signed company checks to INA for installments due when in fact he had obtained the entire premiums from premium financing companies (or from insureds) and kept this plan concealed from INA—actions, which clearly demonstrate his awareness and participation in this scheme. Third, when INAC requested premium funds back from the Hickman Agency, and there was no money to pay the premiums because the money was out-of-trust, Mr. Miller directed the premium financing of another account (Gunther's Leasing worker's compensation policy) expressly for the purpose of repaying the premium due INAC on an unrelated policy. Fourth, consistently throughout this relationship, Mr. Miller, who had knowledge of what was occurring, failed to disclose his, and Hickman's, conflicting actions to INA. As we have said, "[i]t is an elementary principle that fundamental duties of an agent are loyalty to the interest of his principal and the need to avoid any conflict between that interest and his own self-interest." *C–E–I–R, Inc. v. Computer Dynamics Corp.*, 229 Md. 357, 366, 183 A.2d 374, 379 (1962) (quoting *Maryland Credit v. Hagerty*, 216 Md. 83, 90, 139 A.2d 230, 233 (1958)). Mr. Miller placed himself in a position where INA's interests and his interests conflicted. As we discussed, *supra*, one of the primary obligations of an agent to a principal is to disclose any information the principal may reasonably want to know. It is safe to say that Mr. Miller's actions were not made with INA's best interests in mind and that INA would reasonably want to have known of his actions while he was acting as its agent.

We therefore hold that the trial court erred when it ruled that appellee was not an agent of INA for the purpose of collecting and forwarding premiums, and as a result did not

breach any fiduciary duties by failing to do so. To the contrary, Miller had knowledge of what was happening and actively participated in a significant portion of the improper actions. In failing to share his knowledge with INA, and by participating in the scheme, he breached his fiduciary duty to appellant.

## C. The Negligence Claim

Appellant also presents the issue of whether Mr. Miller could be found negligent for his actions surrounding the double financing scheme. While we hold that Mr. Miller knowingly and intentionally breached his fiduciary duty to INA, we shall also address the issue of negligence, which was presented in the appellant's brief. The trial court ruled that Mr. Miller, as an officer of the Hickman Agency, could not be held responsible or personally liable in tort for the actions of the Hickman Agency. The trial court's ruling was primarily based on *Ferguson Trenching Co. v. Kiehne*, 329 Md. 169, 618 A.2d 735 (1993), where we held that generally, "[o]fficers and directors of a corporation generally are insulated from personal liability for the debts of the corporation." *Id.* at 175, 618 A.2d at 738. In *Ferguson Trenching*, we were construing Maryland's construction trust statute, Maryland Code (1974, 1988 Repl.Vol., 1992 Cum.Supp.), sections 9–201 through 9–204 of the Real Property Article. Because that holding was limited to the interpretation of a specific and unrelated statute, *Ferguson Trenching* is, generally, inapplicable to the case at bar.

We hold that, under certain circumstances, an officer of a corporation may be held personally liable for torts of the corporation in which the officer was personally involved. As we have said:

"The general rule is that the corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body. Of course, participation in the tort is essential to liability. If the officer takes no part in the commission of the tort commit-

ted by the corporation, he is not personally liable therefor unless he specifically directed the particular act to be done, or participated or cooperated therein. It would seem, therefore, that an officer or director is not liable for torts of which he has no knowledge, or to which he has not consented. Thus, e.g., to make an officer of a corporation liable for the negligence of the corporation there must have been upon his part such a breach of duty as contributed to, or helped to bring about, the injury; he must have been a participant in the wrongful act."

*Metromedia Co. v. WCBM Maryland, Inc.*, 327 Md. 514, 520, 610 A.2d 791, 794 (1992) (citations omitted).

Additionally, specific to insurance agents in a negligence claim, we have said:

Like conventional agents, an insurance agent must exercise reasonable care and skill in performing his duties. And if such a representative fails to do so, he may become liable to those, including his principal, who are caused a loss by his failure to use standard care.

*Bogley v. Middleton Tavern, Inc.*, 288 Md. 645, 650, 421 A.2d 571, 573 (1980) (a case involving, among other issues, the liability of an agent of a disclosed principal); *see Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 657, 741 A.2d 1099, 1108 (1999) ("We have held that ' "an insured agent must exercise reasonable care and skill in performing his duties" ' and that the agent may become liable in tort to the principal who suffers ' "a loss by [the agent's] failure to use standard care." ' ") (alteration in original); *Popham v. State Farm*, 333 Md. 136, 153, 634 A.2d 28, 36 (1993) ("The principal may sue the agent, either in contract or for negligence in the performance of the duty imposed by the contract."); *see also Canatella v. Davis*, 264 Md. 190, 206, 286 A.2d 122, 130 (1972); *Lowitt & Harry Cohen Ins. Agency, Inc. v. Pearsall Chemical*, 242 Md. 245, 253, 219 A.2d 67, 72 (1966).

To establish a valid cause of action in negligence, a plaintiff must prove the existence of four elements:

"(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached the duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty."

*Baltimore Gas & Elect. Co. v. Flippo,* 348 Md. 680, 700, 705 A.2d 1144, 1153–54 (1998) quoting *Rosenblatt v. Exxon,* 335 Md. 58, 76, 642 A.2d 180, 188 (1994). We have already established that appellee was under a duty, as an agent and a fiduciary, to act in INA's interest. He had a special relationship that, itself, imposed such a duty. By his failure to keep his principal informed and by his active participation in the double financing scheme, appellee breached the duty. Appellee, himself, actually and actively participated and directed at least a significant part of the events constituting the breaches in issue. He was, individually, a tortfeasor. INA suffered actual injury by not receiving premiums that should have been forwarded from the Hickman Agency trust account. This loss proximately resulted from appellee's breach of duty. We therefore hold that the trial court erred when it ruled that appellee was not negligent by obtaining premium financing for an insurance premium of an INA insured, and using the funds to pay another premium financing company, instead of paying the funds directly to INA for the premium due.

### Conclusion

We hold that appellee was an agent of INA for the purpose of collecting and forwarding premiums, which imposed upon him a fiduciary duty to INA, which he personally and actively breached by failing to collect and forward such premiums to INA and by failing to convey to INA his knowledge that the premiums at issue were being diverted from INA to the use of the Hickman Agency. Additionally, appellee personally and actively breached his fiduciary duty to INA when he obtained premium financing for an insurance premium of an INA insured, and used the funds to pay another premium financing company, instead of paying the funds directly to INA for the premium due. We also hold that appellee's actions in the

double financing scheme could constitute negligence. Accordingly, we reverse the ruling of the Circuit Court for Baltimore County and remand the case to that court for further proceedings consistent with this opinion (the assessment and rendering of judgment as to damages).[18]

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED, AND CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS PAID FOR BY APPELLEE.**

---

18. As we have indicated, our holding in this case is based in substantial part on the fact that the agent had actual knowledge that his principal's interests were being improperly, adversely affected and failed to notify the principal, and is based, as well, on the fact that the agent actively participated in the scheme to divert premium funds from the principal.