474

809 A.2d 709

William R. SCHINNERER, et al.,

v.

MARYLAND INSURANCE ADMINISTRATION.

No. 1123, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Oct. 31, 2002.

476

Reginald W. Bours, III (Andrew R. Polott and Poppleton, Garrett & Polott, P.C., on the brief), Rockville, for appellants.

Erik James Delfosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Christina Gerstung Beusch, Asst. Atty. Gen., on the brief), Baltimore, for appellee.

Argued before SONNER, DEBORAH S. EYLER, RAYMOND G. THIEME, JR. (Ret'd, Specially Assigned), JJ.

RAYMOND G. THIEME, JR., Judge, Retired, Specially Assigned.

William R. Schinnerer and W.R. Schinnerer Companies, appellants, seek to set aside a two-year suspension, by the Maryland Insurance Commissioner, of their certificates of qualification to act as an insurance agent.

The Maryland Insurance Administration ("the MIA"), appellee, determined that appellants had violated the Insurance Article in connection with (i) an application to renew a certificate of qualification and (ii) certain transactions with the Hartford Insurance Group Companies ("Hartford"). The MIA recommended that appellants' certificates of qualifications be revoked. The Insurance Commissioner ("the Commissioner") affirmed the violation findings but rejected the recommended sanction and reduced it to a two-year suspension. The Circuit Court for Montgomery County affirmed the Commissioner's order, and appellants filed this appeal.

### ISSUES

Appellants argue, in essence, that:

I. The Commissioner erroneously based his violation findings on a determination that appellants had a fiduciary duty toward Hartford, in that the determination was neither legally correct nor supported by substantial evidence,

II. The Commissioner's determination that appellants misappropriated, converted, or unlawfully withheld funds belonging to Hartford was neither legally correct nor supported by substantial evidence,

III. The Commissioner's determination that appellants failed or refused to pay over premium funds on demand was

neither legally correct nor supported by substantial evidence,

IV. The Commissioner's determination that appellants misrepresented or concealed a material fact on their 1997 renewal application was not supported by substantial evidence and was arbitrary and capricious, and

V. The Commissioner's determination that appellants engaged in dishonest practices or otherwise showed a lack of trustworthiness or competence to act as insurance agents was not supported by substantial evidence.

We find no merit in any of these arguments and affirm the judgment of the trial court.

## FACTS

William R. Schinnerer became an insurance agent in 1965. In the early 1970's, he started his own business, which eventually evolved into W.R. Schinnerer Companies. No consumer complaints have ever been lodged against Mr. Schinnerer or his business.

Hartford was one of many insurance companies for which W.R. Schinnerer Companies sold insurance. W.R. Schinnerer Companies and Hartford were parties to an "Agency Agreement"—Mr. Schinnerer signed the agreement as "Agency Principal." In accordance with the agreement, appellants were authorized, as agents for Hartford,

(1) To solicit insurance for the classes of business which the Company writes in the Agent's territory and to bind, issue and deliver policies therefor which the Company may from time to time authorize to be issued and delivered.

. . .

(3) To collect, receive and receipt for premiums on such policies . . . .

The Agency Agreement provided:

The Agent will submit to the Company by the tenth of each month an account of all premiums on all business

except direct billed business, placed during the previous
month or not previously reported....

... [T]he balances due the Company ... shall be paid
within the number of days specified in ... the declarations
after the end of the month for which the account was
submitted.

The declarations, in turn, specified that the "Number of Days
for Payment of Balances" was 45. This system of payment
was known as the "Account Current System." By way of
example, the system required appellants to report to Hartford
by February 10 all policies sold in January. Appellants then
had until March 15 to collect the premiums for those policies
and remit them to Hartford.

Since 1979, Hartford has permitted appellants to commingle
premiums they collected for Hartford, before they become
due, with other funds. Permission was granted by way of a
letter, which stated:

Consent is hereby given to commingle funds in your
hands which are payable to us with other monies which you
own or hold .... If such funds are deposited in an appropri-
ate interest bearing account, you are authorized to withdraw
such interest for your own use.

As part of this consent, however, we shall require that all
funds payable to us will at all times be ascertainable from
an examination of your books and records.

. . .

This consent in no way alters the terms of our agency
contract or your obligations under that contract to pay all
monies due ...

. . .

In early February of 1996, William R. Schinnerer notified
Hartford that W.R. Schinnerer Companies would be unable to
pay by February 15 what it owed for the policies sold for
Hartford in December of 1995. Mr. Schinnerer indicated that
$188,000 in premiums had been collected, but that the agency

no longer had the money. A similar problem arose in March of 1996. Mr. Schinnerer informed Hartford that the agency would not be able to timely remit $287,000 in premiums that it had collected for policies sold in January. We glean from the record no explanation as to where the money went.

Hartford agreed to transfer the debt out of the Account Current System and into the Special Collections Department, and a new payment schedule was negotiated for the amounts due. Appellants executed two promissory notes for the amounts due and made timely payments until January of 2000, when the notes were paid in full.

Despite the new agreement, counsel for Hartford reported the matters to the Maryland Insurance Administration. By letter dated March 19, 1996, counsel stated:

On behalf of ITT Hartford, I am submitting the following report, in accordance with Section 233B of the Maryland Insurance Code.[1]

Please be advised that W.R. Schinnerer Companies, Inc. (the "Agency"), has failed to pay its accounts current due to ITT Hartford on February 15, 1996 and March 15, 1996. The Agency has advised ITT Hartford that it has collected premium money sufficient to pay these balances but that it is without the necessary funds to pay its accounts current on a timely basis. ITT Hartford and the Agency have negotiated repayment terms for the balances, which aggregate $475,000.

By letter dated April 10, 1996, counsel for the MIA responded:

This Division has received your referral concerning the above named agency. However, since an agreement was reached between Schinnerer and ITT Hartford covering the aggregate amount of unremitted premiums, this is now a

---

1. Effective October 1, 1997, as part of the Code revision process, § 233B of Article 48A was repealed and re-enacted, in substantive part, in Md.Code (1997, 2002 Repl.Vol.), §§ 27-802 and 27-803 of the Ins. Art. See 1997 Laws of Maryland, ch. 35, § 2.

matter involving the "extension of credit" which takes it out of the criminal sphere. As such, we will enter this information on our databases for information purposes only.

In June of 1996, appellants submitted to the MIA an application for renewal of the certificate of qualification held by W.R. Schinnerer Companies. Mr. Schinnerer signed the application as the "Licensee/Firm Representative." In the section that preceded the signature, the applicant was asked to check boxes indicating "yes" or "no" in response to a list of questions. One of the questions asked: "Are you presently indebted to any insurer, agent, or broker, or has any demand been made upon you for overdue premiums?" The applicants answered "no."

Appellants timely paid the premiums they collected, in accordance with the Account Current System, until March of 1998. Early that month, Mr. Schinnerer informed Hartford that he would be unable to remit by March 15 the premiums collected for policies sold in January of 1998. The record reflects that the agency was then in the process of moving to new offices. It had applied for a loan to pay for renovations, but the loan had not been approved. The monies collected for premiums were used to fund the renovations.

Counsel for Hartford promptly reported the delinquency to the MIA. In a letter dated March 26, 1998, counsel wrote:

On behalf of The Hartford, I am submitting the following report, in accordance with Section 233B of the Maryland Insurance Code.

Please be advised that W.R. Schinnerer Companies, Inc. (the "Agency"), has failed to pay, in full, its account current due to The Hartford on March 15, 1998. The Agency has advised The Hartford that it has collected premium money sufficient to pay these balances but that it is without the necessary funds to pay the account current on a timely basis. The Hartford and the Agency are in the process of negotiating a plan for the repayment of this debt, which is approximately $314,000.

Negotiations to resolve the matter lasted several months. Ultimately, Hartford agreed to transfer the debt out of the Account Current System and into the Special Collections Department, as it had done in 1996. In September of 1998, the agency executed a promissory note to Hartford for $307,201.

While the negotiations were underway, the MIA launched an investigation. The investigators concluded that appellants had violated the Insurance Article by: failing to disclose the indebtedness to Hartford on the June 1996 application for renewal of W.R. Schinnerer Companies' certificate of qualification; misappropriating, converting, or unlawfully withholding money belonging to Hartford; committing fraudulent or dishonest practices in the insurance business; failing or refusing to pay over on demand money belonging to Hartford; and otherwise showing a lack of trustworthiness or competence to act as an insurance producer.[2] In March of 1999, the Commissioner issued an administrative order revoking appellants' certificates of qualification to act as an insurance agent.

Appellants requested a contested case hearing, and a hearing was held before an administrative law judge in January of 2000. The administrative law judge agreed that appellants had violated the Insurance Article. She recommended that the Commissioner revoke the certificates of qualification.[3]

Appellants filed exceptions to the administrative law judge's recommendation. The Commissioner thereafter reviewed the recommendation and determined that the revocation sanction was too severe in light of appellants' "lengthy and unblemished past record." The Commissioner thus issued a "Final Order" affirming the administrative law judge's findings of fact and conclusions of law but rejecting the revocation recom-

---

**2.** See Md.Code (1997, 2001 Cum.Supp.), § 10–126(a)(2), (4), (6), (12), and (13) of the Ins. Art.

**3.** See generally Code (1997, 2001 Cum.Supp.), §§ 2–210—2–214 of the Ins. Art. and Md. Regs.Code tit. 31, §§ 02.02.01—02.02.15 (regarding contested case hearings).

mendation and instead suspending the certificates of qualification for a period of two years.

Appellants appealed to the Circuit Court for Montgomery County [4], which affirmed the Commissioner's decision. They then filed the instant appeal. The revocation of the certificates of qualification has been suspended pending this Court's decision.

## STANDARD OF REVIEW

Section 2–215(h) of the Insurance Article provides that, in reviewing a decision of the Insurance Commissioner,

[t]he court to which an appeal is taken may:

(1) affirm the decision of the Commissioner;

(2) remand the case for further proceedings; or

(3) reverse or modify the decision of the Commissioner if substantial rights of the petitioners may have been prejudiced because administrative findings, inference, conclusions, or decisions:

(i) violate constitutional provisions;

(ii) exceed the statutory authority or jurisdiction of the Commissioner;

(iii) are made by unlawful procedure;

(iv) are affected by other error of law;

(v) are unsupported by competent, material, and substantial evidence in view of the entire record, as submitted; or

(vi) are arbitrary or capricious.

Md.Code (1997, 2001 Cum.Supp.), § 2–215(h) of the Ins. Art.

 As the Court of Appeals has summarized:

Ordinarily, a final order of the Commissioner must be upheld on judicial review if it is legally correct and reasonably supported by the evidentiary record .... This standard of review is both narrow and expansive. It is narrow to the extent that reviewing courts, out of deference to agency

---

4. *See* Code (1997, 2001 Cum.Supp.), § 2–215 of the Ins. Art.

expertise, are required to affirm an agency's findings of fact, as well as its application of law to those facts, if reasonably supported by the administrative record, viewed as a whole.... The standard is equally broad to the extent that reviewing courts are under no constraint to affirm an agency decision premised solely upon an erroneous conclusion of law....

*Insurance Commissioner v. Engelman,* 345 Md. 402, 411, 692 A.2d 474 (1997) (citations omitted).

## DISCUSSION

The Commissioner concluded that appellants violated subsections (2), (4), (6), (12), and (13) of § 10–126(a) of the Insurance Article. In pertinent part, the statute provides:

(a) *Grounds.*—The Commissioner may ... revoke ... a license after notice and opportunity for a hearing ... if the ... holder of the license:

. . .

(2) has intentionally misrepresented or concealed a material fact in the application for a license;

. . .

(4) has misappropriated, converted, or unlawfully withheld money belonging to an insurer ...;

. . .

(6) has committed fraudulent or dishonest practices in the insurance business;

. . .

(12) has failed or refused to pay over on demand money that belongs to an insurer ...;

(13) has otherwise shown a lack of trustworthiness or competence to act as an insurance producer[.]

. . .

Code (1997, 2001 Cum.Supp.), § 10–126 of the Ins. Art.

### I.

■ Appellants contend that the Commissioner's decision was based at least in part on his belief that appellants owed a fiduciary duty to Hartford. They argue that this belief was erroneous as a matter of law and as a matter of fact. Appellants assert that their written agreement with Hartford, as well as MIA regulations, established that as a matter of law they were not required to hold, for Hartford's benefit, the premiums they collected. Appellants further assert that the facts before the Commissioner established that, at least as to the funds in question, their relationship with Hartford was not a fiduciary relationship but that of a debtor and creditor. This is so, they contend, because they negotiated an extension of credit from Hartford before the payments became due. The assertions are unfounded.

■ As we have indicated, appellants and Hartford were parties to a written "Agency Agreement," by which appellants were the agent and Hartford was the principal. An agency is " 'the *fiduciary relation* which results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his control and consent by the other so to act.' " *Ins. Co. of N. Am. v. Miller*, 362 Md. 361, 373, 765 A.2d 587 (2001) (citations omitted; emphasis added). *See also Travel Comm., Inc. v. Pan Am. World Airways, Inc.*, 91 Md.App. 123, 161, 603 A.2d 1301 (1992). The Court of Appeals has determined, moreover, that "[i]t is clear under the Code of Maryland Regulations (CO-MAR) that keeping funds 'in trust' is one of the duties of insurance agents." *Miller*, 362 Md. at 377, 765 A.2d 587.

With the Agency Agreement, Hartford expressly authorized appellants to sell insurance policies and to collect premiums on the policies sold. It established the Account Current System for the remission of the collected premiums. Appellants contend that because Hartford permitted them to commingle

funds, and in light of the regulations promulgated by the Insurance Commissioner, they did not hold in trust for Hartford the premiums they collected.

Nothing in the letter authorizing appellants to commingle funds supports this contention. The 1979 letter from Hartford to appellants permits appellants to "commingle funds in your hands which are payable to us with other monies which you own or hold. . . ." The letter contemplates that such funds will be held for Hartford until due. It states that, if the funds "are deposited in an appropriate interest bearing account, [appellants] are authorized to withdraw such interest for [their] own use." The letter does *not* authorize appellants to put any portion of the principal to their own use. Indeed, it specifically requires that "all funds payable to us will at all times be ascertainable from an examination of your books and records." The letter states that the authority to commingle funds "in no way alters the terms of our agency contract or your obligations under that contract to pay all monies due . . . within the time limits set out in the contract." Nor does any regulation promulgated by the Commissioner suggest that appellants are entitled to use the premiums before remitting the amount due to Hartford. To the contrary, the applicable regulations provide:

.01 *General Requirements.*

. . .

B. Agents and brokers who do not make prompt remittance to principals and assureds of the funds shall deposit them in one or more appropriately identified accounts in a bank or banks authorized to do business in this State or subject to the jurisdiction of this State, from which withdrawals may not be made except as hereinafter specified (any such account is hereinafter referred to as a "premium account").

. . .

E. Withdrawals.

(1) Withdrawals from a premium account may not be made other than for the following purposes:

(a) Payment of premiums to principals.

(b) Transfer to an operating account of bank interest, if the principals have consented to it in writing.

(c) Transfer to an operating account of commissions either actual or average . . . .

(d) Withdrawal of [deposits made in excess of premiums in order to maintain a minimum balance].

(e) Payment of return deposits to assureds.

(f) Payment of return premiums to assureds in the ordinary course of business when a written agreement with the principal authorizing this practice exists.

(2) However, a withdrawal may not be made if the balance remaining in the premium account thereafter is less than aggregate met premiums, returns premiums, and deposits received but not remitted.

. . .

*.02 Account Current System.*

In the case of an agent or broker operating under an account current system, maintenance at all times in one or more premium accounts of at least the net balance of premiums as determined by either actual or average commissions, return premiums, and deposits received but not remitted, shall be construed as compliance with this chapter, provided that the funds so held for each principal are readily ascertainable from the agent's or broker's records.

Md. Regs.Code tit. 31, §§ 03.03.01 and .03.03.02. Thus, the regulatory scheme clearly requires insurance agents such as appellants to deposit and keep the premiums they collect in appropriate accounts until they become due.

Appellants argue that the cited provisions are inapplicable to insurance agents who are permitted to commingle funds. In support of this argument, appellants direct us to part A of

Md. Regs.Code tit. 31, § 03.03.01, and to Md. Regs.Code tit. 31, § 03.03.04. The first provision states:

> Every insurance agent and broker acting as such in this State who does not have the express written consent of his or its principals to mingle premium monies with his or its personal funds shall hold the premium monies separate from other funds in accordance with this regulation.

Md. Regs.Code tit. 31, § 03.03.01A. The latter provision sets forth the required form for a letter authorizing the commingling of funds. *See* Md. Regs.Code tit. 31, § 03.03.04. Contrary to appellants' suggestion, neither regulation—nor any other that we have discovered—in any way implies that insurance agents who have commingling authority are exempted from the requirement that they deposit and keep collected premiums in an appropriate account. Appellants offer no rationale for any such exemption.

At the contested case hearing, various witnesses for Hartford testified to the effect that commingling authority is granted for the convenience of the agents. Commingling eases the administrative burden of agents by freeing them from maintaining separate bank accounts for each insurer they represent. Moreover, the larger accounts may earn more interest than separate accounts would, and agents are permitted to keep the interest earned on the commingled funds. *See id.* There is simply no reason to believe that the authority to commingle collected premiums equates to *carte blanche* to *use* those premiums before they become due.

Appellants suggest that, even if the Agency Agreement and regulations did not permit their use of the funds, the extensions of credit they negotiated with Hartford transformed any fiduciary relationship that may have existed into a debtor/creditor relationship. The Commissioner rejected this suggestion, and his determination is supported by substantial evidence.

Mr. Schinnerer testified at the hearing that he notified Hartford, before each of the three payments were due, that appellants would be unable to make the payments on time.

Mr. Schinnerer contended that Hartford voluntarily extended credit to appellants, and pointed out that appellants paid Hartford more than $125,000 in interest in connection with the three promissory notes. Witnesses for Hartford indicated, however, that Hartford had no real choice in the matter. Its refusal to accept appellants' terms would have effectively put appellants out of business. The record amply supported the administrative law judge's determination, which was accepted by the Commissioner, that:

> When [appellants] failed to pay [Hartford] the premiums due and owing it on three separate occasions, [they] put the insurance company in a financial dilemma. The insurance company could exercise its rights to pursue recovery of its money via litigation or criminal action. In either such case, [appellants] would immediately seek bankruptcy protection, and [Hartford] would not likely recover any of its money that had been misappropriated by [appellants]. However, the insurance company could accept [appellants'] terms and agree reluctantly to accept their terms for repayment via promissory notes. Clearly, [appellants] had [Hartford] "over a barrel" with regard to the repeated withholding of the company's money. The fact that [appellants] and [Hartford] began negotiations for the first promissory note on or before the remittance due date of March 15, 1996 does not render the resulting transaction a loan . . . .

As the administrative law judge recounted in her recommended decision, evidence presented at the contested case hearing established that Hartford did at one time have a loan program in place for its agents. Indeed, Mr. Schinnerer had taken advantage of the program. Hartford discontinued the program, however, because it was not profitable and because agents were defaulting on the loans. The program was not in place when appellants used the funds in question.

In short, appellants *did* owe a fiduciary duty to Hartford. The Commissioner properly considered that duty in concluding that appellants committed the alleged violations of the Insurance Article.

## II.

■ The Commissioner concluded that appellants violated § 10–126(a)(4) of the Insurance Article by "misappropriat[ing], convert[ing], or unlawfully withh[olding] money" belonging to Hartford. Appellants contend that this conclusion was not supported by substantial evidence and was legally incorrect. Appellants posit that the evidence established that they "were authorized by Hartford at all times" to use the money. They suggest that, in order to find a violation of the statute, the Commissioner must have relied on an interpretation that was "not consistent with the principles of statutory construction." Appellants further argue that, because the MIA declined in 1996 to pursue the report from Hartford's counsel, to the effect that appellants had spent premiums instead of remitting them, the MIA should have been equitably estopped from investigating the matter after receiving the 1998 report from counsel.

As we indicated in part I of our discussion, appellants' contention that they were "authorized" to use the premiums is belied by the record. Witnesses for Hartford testified at the contested case hearing that appellants *first* spent the money, *then* informed Hartford that they would be unable to remit the premiums timely. At that point Hartford had no choice but to extend credit to appellants; if it declined to do so, appellants would go out of business and Hartford would never get paid. There was thus substantial evidence in the record to support the Commissioner's conclusion. *See* Black's Law Dictionary 1013 (7th ed.1999) (defining "misappropriation" as "[t]he application of another's property or money dishonestly to one's own use)"; *id* at 333 (defining "conversion" as "[t]he wrongful possession or disposition of another's property as if it were one's own").

■ Appellants' contention that the MIA should have been equitably estopped from pursuing the case against them is specious. " 'An essential element of estoppel is that the person sought to be estopped must be guilty of some wrongful or unconscientious conduct, on which the other party has

relied and been misled to his injury.' " *Subsequent Injury Fund v. Ehrman,* 89 Md.App. 741, 756, 599 A.2d 875 (1992)' (citation omitted).

We perceive nothing "wrongful or unconscientious" about the MIA's conduct. Section 10–126(a) of the Insurance Article provides that the Commissioner "may" take action against an agent upon determining that the agent has committed certain violations. "The word 'may' in statutory authority 'bears its ordinary significance of permission unless the statute shows that it is meant to be imperative: "only when the context or subject-matter compels such construction." ' " *Stavely v. State Farm Mut. Auto. Ins. Co.,* 138 Md.App. 1, 9, 769 A.2d 1008 (citations omitted), *cert. granted,* 365 Md. 65, 775 A.2d 1216 (2001). " '[W]hen an administrative agency is vested with discretion, and exercises [such discretion] within the scope of its authority, the courts will not intervene and substitute their judgment for that of the administrative agency.' " *Id.* at 11, 769 A.2d 1008 (citation omitted).

When counsel for Hartford reported the first two delayed payments in 1996, appellants had an unblemished record and Hartford had already negotiated an extension of credit with appellants. The MIA may have reasonably believed that appellants' use of the premiums was an isolated incident, and that action on the MIA's part was unnecessary. Two years later, however, when counsel reported the third delay, a pattern had emerged. Appellants had now used more than three quarters of a million dollars belonging to Hartford without obtaining Hartford's prior permission. When the 1998 report was filed, the parties had not yet agreed on the terms of an extension of credit. This time, the MIA quite reasonably concluded that administrative action was warranted.

### III.

The Commissioner further determined that appellants "failed or refused to pay over on demand money that belongs to an insurer," in violation of § 10–126(a)(12) of the Insurance

Article. Appellants contend that Hartford never made a "demand" for payment "because [a]ppellants had already arranged for extension of terms before payment was due." For the same reason, appellants argue, they never failed or refused to pay. Appellants conclude that the Commissioner's decision was contrary to law and was not supported by substantial evidence.

Again, appellants' argument rests on the mistaken assumption that the record establishes that Hartford's extension of credit was voluntary. Appellants indicated to Hartford that they had spent the premiums and would not be able to make the scheduled payment. Only then did Hartford negotiate an alternative payment plan with appellant.

As we have indicated, the Agency Agreement expressly stated that "the balances due the Company [under the Account Current System] shall be paid within the number of days specified in ... the declarations after the end of the month for which the account was submitted." The declarations specified that the "Number of Days for Payment of Balances" was 45. Like the Commissioner, we are satisfied that these provision amounted to a standing "demand" to remit the premiums as they came due.

## IV.

Appellants next take issue with the Commissioner's determination that they violated § 10–126(a)(2) of the Insurance Article by "intentionally misrepresent[ing] or conceal[ing] a material fact in the application for a license." The Commissioner concluded that the intentional misrepresentation occurred in June of 1996, when Mr. Schinnerer answered "no" to the question on the renewal application that asked: "Are you presently indebted to any insurer, agent, or broker, or has any demand been made upon you for overdue premiums?" Appellants argue, in essence, that the Commissioner should have accepted as credible Mr. Schinnerer's testimony that he believed he answered the question accurately, in that in his view appellants were not indebted to Hartford at the time for any

overdue premiums. Appellants suggest that the Commissioner might have accepted the testimony but for an erroneous factual determination made by the administrative law judge—that Mr. Schinnerer had denied reading the application before signing it and that his denial was not credible.

We shall assume, without deciding, that appellants are correct in their assertion that the record does not support the administrative law judge's finding that Mr. Schinnerer denied reading the application.[5] As appellants contend, in rejecting Mr. Schinnerer's testimony that he believed he had answered the question accurately the Commissioner relied on the administrative law judge's determination that Mr. Schinnerer was not a credible witness. The Commissioner specifically referred to Mr. Schinnerer's supposed testimony that he did not read the application before signing it. We are nevertheless satisfied that the Commissioner's conclusion would not have been different but for the erroneous factual finding of the administrative law judge.

As the Commissioner indicated, the administrative law judge's belief that Mr. Schinnerer had denied reading the application was only one of many reasons why the administrative law judge found Mr. Schinnerer to be lacking in credibility. The Commissioner summarized:

> The ALJ specifically notes that, although Mr. Schinnerer was able to meet the ALJ's gaze early in direct testimony, Mr. Schinnerer "was unable to look [the ALJ] in the eye while testifying about his version of events when he entered

---

**5.** A portion of Mr. Schinnerer's testimony included in the record extract reads as follows:

 Q. . . . Did you check the boxes, by the way?
 A. .No.
 Q. Physically? You didn't check them yourself. But you signed it and we've been through that. . . .

There is apparently some confusion as to whether Mr. Schinnerer meant, when he indicated that he did not "check" the boxes, that he did not review them or that he personally did not place the check marks in them. In any event, counsel's questioning suggests that testimony on the subject was elicited at an earlier point during the hearing. That testimony apparently has not been included in the. record extract.

into the promissory note agreements with [The Hartford] for repayment of the monies due [to the Hartford].... In her discussion, the ALJ provided numerous examples of testimony by Mr. Schinnerer which were not only "not supported by the record" but, as well, "not worthy of belief."

To reiterate, the particular question at issue asked: "Are you presently indebted to any insurer, agent, or broker, *or* has any demand been made upon you for overdue premiums?" (Emphasis added.) Clearly, by its two-pronged nature, the question asked whether the applicant was indebted in connection with any funds *other* than premiums, or whether it was indebted for overdue premiums. Appellants' contention that Mr. Schinnerer reasonably believed that the question should be answered in the affirmative only if appellants were indebted for overdue premiums is nonsensical. It was properly rejected by the Commissioner.

## V.

Finally, appellants challenge the Commissioner's conclusion that, within the meaning of § 10–126(a)(13) of the Insurance Article, they showed "a lack of trustworthiness or competence to act as an insurance producer[.]" Appellants argue that the conclusion "cannot stand independent of its findings of specific violations of law alleged in this case, as it is based solely on its findings that [a]ppellant's handling of Hartford premium collections violated the law and that William R. Schinnerer's answer to question 7E of his 1997 license renewal application ... was, to his knowledge, untrue and misleading." Because we affirm the other specific violation findings made by the Commissioner, the argument is without merit.

**JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.**